## Richmond

CHARLES EDWARD RODGERS v. COMMONWEALTH OF VIRGINIA.

November 28, 1955.

Record No. 4458.

Present, Eggleston, Spratley, Buchanan, Miller, Smith and Whittle, JJ.

The opinion states the case.

*Gilmer, Harman & Sadler*, for the plaintiff in error.

*J. Lindsay Almond, Jr., Attorney General* and *R. D. McIlwaine, III, Assistant Attorney General*, for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

Charles Edward Rodgers has been convicted of operating a motor vehicle while under the influence of intoxicants, Code § 18-75, and sentenced to pay a fine. He assigns error to the admission in evidence of the results of an analysis of blood alleged to be his, and to the giving of an instruction to the jury.

On the night of December 2, 1953, a car driven by Rodgers was involved in a collision with another car on U. S. Highway 11 a short distance east of Dublin, in Pulaski county. A Dublin police officer went to the scene and found the defendant "wobbly and staggering" and with a strong odor of alcohol on his breath. He expressed the opinion that Rodgers was "considerably intoxicated."

A State trooper was called and found the defendant standing beside his automobile. He had an odor of alcohol on his breath, seemed to be unsteady on his feet and was not coherent. In the opinion of the trooper the defendant was intoxicated. He placed him under arrest and brought him to Pulaski, the county seat.

The evidence given by the defendant and his witnesses was to the effect that he was not intoxicated. The resulting conflict in the evidence was for the jury to settle.

On the way to Pulaski the defendant insisted on being taken to the Pulaski hospital for a blood test. The trooper took him there and a sample of his blood was taken. At the beginning of the trial the defendant objected to the introduction of the blood analysis unless it was properly identified. Thereupon, in the absence of the jury, the court heard evidence on the point from the trooper, the technician who took the sample and the State Toxicologist. The defendant then moved to exclude from the evidence the result of the analysis because the sample analyzed had not been sufficiently identified. The court overruled the motion and defendant excepted.

We may assume, without deciding, that the trial court ruled correctly that the evidence heard by it furnished a sufficient foundation for the introduction of the analysis. Thereupon, as stated in the Commonwealth's brief, it was for the jury to determine after hearing the testimony submitted to it whether the blood analyzed was that taken from the defendant. *Pomainville* v. *Bicknell*, (Vt.), 109 A. (2d) 342; Annotation, 21 A. L. R. (2d) 1216, at 1219.

While the evidence heard by the jury on the question of the identity of the blood came from the same witnesses who testified before the court, their testimony before the jury, as shown by the

record, omitted some important statements made to the court. The evidence before the jury was as follows:

A doctor connected with the Pulaski hospital testified that on the request of the trooper he authorized the technician, Miss Phipps, to take the blood sample but he was not at the hospital when it was done and knew nothing further about it.

The technician testified that she was called from her home to the hospital on December 2, 1953, about ten or ten-thirty at night, and there took a sample of blood, using standard procedure for an alcohol test, from a person who said his name was Rodgers. She did not recognize him in the courtroom. She said she put the blood into two tubes, one plain and one with potassium oxalate. She did not remember whether the trooper furnished her with a tube. She did not remember whether she labeled the tubes but said she prepared them both for mailing to the State laboratory. On cross-examination she said she sent both of the tubes away, either to Abingdon or Richmond, her best impression was to Abingdon. Asked if she remembered packaging the sample, she replied she wouldn't swear to it but she was the only one there; that it could have been packaged next morning for mailing but "the one that took it the night before would certainly mail it the next morning probably." On questioning by the court she said, "We label everything we do;" that she did not recall writing anything on this particular tube, "But surely I did is all I can say."

The trooper testified that he was present when the blood sample was taken but did not know what the technician did with the sample; that he furnished her with a container for mailing the sample like one he filed as an exhibit, being a test tube with label attached together with a mailing carton and mailing label already addressed to the Office of the Chief Medical Examiner in Richmond. While on direct examination he said he saw the technician label the sample, on cross-examination he said he could not be certain of that; that he did not see her fill in the label on the tube or prepare it for mailing. He said that after she got the blood and he gave her his name and told her he wanted a copy of the report, he and the defendant immediately left. She was then writing something, and he did get a copy of the report.

The evidence of Dr. Kaye, the State Toxicologist, before the jury appears in the record only in narrative form. He testified that an alcohol content of .15% in the blood stream was enough to make

any person intoxicated; that there was no question that an amount from .15% up would produce intoxication. "He further testified that the sample analyzed, which bore the name of the defendant, showed an alcoholic content of .21% and that in his opinion this was sufficient to cause heavy intoxication. He testified that a man with this much alcohol in his blood stream would be approaching the 'dreamy' stage."

The quoted language next above is, according to the record, all the evidence before the jury as to the receipt and analysis of the blood at Dr. Kaye's office.*

The result of this blood analysis was necessarily weighty evidence in the case. The court properly instructed the jury that before they should consider the result of the blood test as evidence against the defendant, the Commonwealth must prove beyond a reasonable doubt that the blood analyzed was the blood of the defendant.

The evidence before the jury showed that a sample of the defendant's blood was taken on the night of December 2, 1953, according to standard procedure, and that it was put into two tubes which were sent to Abingdon, according to the best impression of the technician. Whether and how these tubes were labeled was not established. When and by whom they were mailed is not definitely shown. If sent to Abingdon, the evidence does not show who received them there, or how and by whom they were forwarded to Richmond. At some time not shown to the jury a sample of blood "which bore the name of the defendant" was analyzed by Dr. Kaye. When it had been received, in what it had been contained, by whom and in what manner the defendant's name appeared, the evidence does not disclose. Neither container nor labels were produced at the trial.

Such inconclusive and unsatisfactory evidence cannot be said to

---

* The record shows that Dr. Kaye gave some additional testimony before the court relating to customary procedures in regard to receipt and analysis of blood samples. He there testified that his records showed the receipt of a blood sample "in the case of Charles Rodgers," in Richmond on December 7, 1953; that such samples come to the laboratory and his assistant logs them in; that as a usual rule he does not see the sample before it is unpacked and ready for analysis, and he did not know what type of container this blood came in, and that the container had been disposed of and was no longer available.

The trooper testified before the court that the technician put the sample of blood in a tube which he furnished her and which was sent to him from the Chief Medical Examiner's office, and that the technician labeled the tube in his presence and put it into a container addressed to the Medical Examiner's office.

establish beyond a reasonable doubt that the blood analyzed was in fact the blood of defendant. Such an analysis is important evidence in a trial of this sort, and care must be exercised to establish the essential links in the chain of evidence relied on to identify the blood analyzed as being the blood taken.

"* * It is rudimentary that a specimen taken from a human body for the purpose of analysis must be identified before such specimen or any analysis made from it attains standing as evidence of the condition of the person whose conduct is questioned. Without identification, there is no connection between the two. * *." *McGowan* v. *Los Angeles*, 100 Cal. App. (2d) 386, 223 P. (2d) 862, 21 A. L. R. (2d) 1206, at 1212.

In proving identity legal presumptions may of course be relied on unless rebutted, *e.g.*, that articles regularly mailed are delivered in substantially the same condition in which they were sent, *Schacht* v. *State*, 154 Neb. 858, 50 N. W. (2d) 78, 80; and that an analysis made by an official in the regular course of his duties was properly made, 20 Am. Jur., Evidence, §§ 170-1, pp. 174-8. But where the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done with it between the taking and the analysis. See generally *Brown* v. *State*, 156 Tex. Cr. 144, 240 S. W. (2d) 310; *American Mut. &c. Co.* v. *Industrial Accident Commission*, 78 Cal. App. (2d) 493, 178 P. (2d) 40; *Novak* v. *District of Columbia*, 82 App. D. C. 95, 160 F. (2d) 588; *State* v. *Romo*, 66 Ariz. 174, 185 P. (2d) 757; Annotation, *supra*, 21 A. L. R. (2d) 1216, at 1220 *ff*.

On defendant's motion to strike the evidence, made at the conclusion thereof, the court should have excluded from the jury the evidence of the analysis for lack of proper identification, and failing that should have sustained the motion of the defendant to set aside the verdict for the admission of that evidence.

On retrial Instruction C, the subject of defendant's second assignment of error, should not be given. It was in these words: "The court instructs the jury that under the influence of intoxicants covers not only all the well known and easily recognized conditions and degrees of intoxication, but any abnormal mental or physical condition which is the result of indulging in any degree in intoxicating beverages which tends to deprive one of that clearness of intellect and control of oneself which one would otherwise possess."

In *Gardner* v. *Commonwealth*, 195 Va. 945, 954, 81 S. E. (2d)

614, 619, we referred to the fact that the General Assembly had adopted its own definition of intoxication in these words: "Any person who has drunk enough alcoholic beverages to so affect his manner, disposition, speech, muscular movement, general appearance or behavior, as to be apparent to observation, shall be deemed to be intoxicated." Code § 4-2(14).

We there said: "This definition if applied in all pertinent cases tends to make the law consistent, uniform, certain, stable, and fair, a much desired goal." An instruction in the language of this statute would be correct and sufficient on that point.

The judgment of conviction is reversed and the case is remanded for a new trial.

*Reversed and remanded.*