Marian E. Woolley, Administrator of the Estate of
Winton Kenneth Woolley, Deceased, Plaintiff-
Appellant, v. Hafner's Wagon Wheel, Inc., a Cor-
poration, Defendant-Appellee.

Gen. No. 11,382.

Second District, Second Division.
September 8, 1960.
Rehearing denied September 30, 1960.

Bozeman, Neighbour, and Patton, of Moline, for appellant.

Moran, Klockau, McCarthy, Schubert, and Henss, of Rock Island, for appellee.

WRIGHT, J.

This action was instituted under the Illinois Dram Shop Act by the plaintiff, Marian E. Woolley, Administrator of the Estate of Winton K. Woolley, deceased, to recover damages for the loss of her means of support because of the death of her husband, the deceased, which allegedly resulted from his intoxication.

A jury returned a verdict of not guilty in favor of the defendant, Hafner's Wagon Wheel, Inc., a Corporation. Judgment was entered on the verdict. Posttrial motions of the plaintiff were overruled and plaintiff appeals.

It is contended by the plaintiff that the trial court erred (1) In refusing to admit the plaintiff's evidence relating to a blood alcohol test on a specimen taken from the decedent's body. (2) In refusing to give an instruction offered by plaintiff; and (3) In submitting an improper interrogatory on behalf of the defendant.

Evidence of the results of a blood alcohol test made from a purported specimen taken from the body of the deceased at 11:25 o'clock P.M. on the night of his injury was offered in evidence by the plaintiff for the purpose of proving the intoxication of deceased at the time of his injuries. This evidence was offered out of the presence of the jury and objected to by defendant for the reason that a proper foundation was not laid to justify its admission.

The trial court sustained the objection and refused the evidence of the results of the blood alcohol test on the ground that no proper foundation was laid for its admission in that the evidence failed to show proper intra-laboratory delivery of the blood specimen from Edward Park, who drew the specimen, to his fellow employee, Charles Lantz, who performed the analysis. A proper consideration of this question requires a de-

tailed review of the evidence with respect to the securing, delivery, unchanged condition and analysis of the blood specimen.

Winton K. Woolley, the plaintiff's decedent, was a blind man, thirty-five years of age, self-employed as a trucker and contractor. Woolley partially conducted his business from the defendant tavern. He would on occasions meet his customers and drivers in that place and receive and make telephone calls. On January 2, 1957, plaintiff's decedent was taken to the defendant tavern by one of his employees at about 11:00 o'clock in the morning and remained there the rest of the day until he left about 5:30 o'clock in the afternoon. Upon leaving the tavern, he started to walk to his home, and at that time it was dark and while walking about four blocks from the tavern in a street with which he was familiar he was struck down by a car driven by Thorston Becker and received severe injuries which resulted in his death seven days later on January 9, 1957.

At the request of the plaintiff, Dr. Robert J. Graham, the attending physician, requested Quad-Cities Pathologists Group, a partnership of four physicians which operated the laboratory facilities of four hospitals in the quad-city area, including Moline Public Hospital, to take a blood specimen from Winton K. Woolley for analysis as to alcoholic content.

Edward Park, an employee of Quad-Cities Pathologists Group, a trained and experienced laboratory technician, drew seven to ten cubic centimeters of blood from the arm of Winton K. Woolley at 11:25 o'clock P.M. in room 220 in Moline Public Hospital on January 2, 1957, placed the blood from the syringe into a bottle (a facsimile of the bottle was offered in evidence as Plaintiff's Exhibit No. 10). Park then returned to the laboratory, filled out a label, recorded the patient's name and room number thereon, signed

4

his name to it, affixed the label to the bottle and placed the bottle in the laboratory's refrigerator. He then recorded the same information in the "Night Call Book," a book of original entries kept by the Quad-Cities Pathologists Group covering all night laboratory calls made by them. Park then addressed a note to the secretary, Mrs. Rietus, also an employee of Quad-Cities Pathologists Group (who did not come to work until the following morning), containing the patient's name and room number and advising her that the blood specimen was in the refrigerator of the laboratory so that it would be picked up in the morning and taken to the Group's laboratory in St. Luke's Hospital in Davenport, Iowa, for analysis.

On the following day, January 3, 1957, Charles Lantz, a clinical biochemist, employed by the Quad-Cities Pathologists Group, at its laboratory in St. Luke's Hospital in Davenport, Iowa, analyzed a blood specimen containing the name of Winton Woolley, and found that it contained 82 milligrams of alcohol per 100 cubic centimeters of blood (abbreviated as mg. %). He used the Johnson-Gibson procedure, a commonly accepted test. He recorded the results of his test in another original book of entries of Quad-Cities Pathologists Group kept at St. Luke's laboratory, known as the "Blood Alcohol Log Book," transferring the information from the label filled out by Park in the Log Book, which said Log Book was offered in evidence as Plaintiff's Exhibit No. 11.

Newell T. Braatelien, M. D., a pathologist trained in the effect of alcohol on a human being, who was the head of the laboratory, testified that a person's system oxidizes alcohol at a constant rate and applying a scientific formula, he stated that the concentration of alcohol in Woolley's blood at the time of his injury (339 minutes before the sample was taken) was 166 mg. %; that 150 mg. % represents intoxication and

5

that in his opinion Woolley was intoxicated at the time of his injury at 5:46 o'clock P. M.

Three witnesses testified as to the delivery procedures used by the Quad-Cities Pathologists Group in transporting blood specimens from its laboratory in Moline Public Hospital to its laboratory in St. Luke's Hospital for analysis and stated that it was not customary for the laboratory to keep a record of the identity of the person delivering the specimen and that a record was not kept in this case. There was, however, a definite delivery routine and the same procedure was followed in all cases. The evidence was that when a specimen was taken at night, the laboratory at St. Luke's would be notified early the next morning and the specimen would be picked up from twenty to forty-five minutes after the call was received at St. Luke's. That during January, 1957, all of the specimens were picked up and delivered either by Charles Lantz or Dwight Summers, both employees of the Quad-Cities Pathologists Group. Lantz and Summers both testified that it was most probable Lantz that picked up and delivered the Woolley specimen. There was evidence to the effect that Dr. Braatelien, the pathologist and partner in the Quad-Cities Pathologists Group, or one Jack Mehl, another employee of the Group, might possibly have on rare occasions delivered a specimen, but both were called and testified that neither of them ever delivered a specimen. The evidence was further to the effect that once a specimen is taken it remained at all times in the hands of the Quad-Cities Pathologists Group and that in the range of experience of all of the laboratory personnel there had never been a single case of loss, misplacing, mislabeling or tampering with a blood specimen handled by the Group, nor had there been a single case of false or incorrect entry ever having been made in any book or records of the Group with respect to a blood specimen. All of the

6

foregoing testimony with respect to the analysis of the blood specimen was offered outside the presence of the jury and on objection of defendant was refused.

No case is cited in either of the briefs submitted by plaintiff or defendant where the Supreme Court of Illinois has directly passed on the question of the admissibility of evidence obtained by means of a chemical analysis of bodily breath or fluids on the issue of intoxication and our own independent search has failed to reveal any.

The Appellate Court, First District, in People v. Bobczyk, 343 Ill. App. 504, 99 N.E.2d 567, held that the results of a drunkometer test was competent and admissible in evidence on the issue of intoxication.

■ The weight of authority in this country has adopted and is now following the rule that subject to a proper foundation, the results of a drunkometer test and blood alcohol test are competent and admissible on the issue of intoxication. 20 Am. Jur. (1959 Supp.), Evidence, Sec. 876, 127 ALR 1513 and 159 ALR 209. We hold that the results of a blood alcohol test is competent and admissible in evidence on the issue of intoxication upon a proper foundation being first laid. The defendant concedes this to be the rule but strenuously argues in the instant case that no proper foundation was laid to justify the admission of the results of the blood alcohol test in evidence.

In a recent revision of Donigan's Treatise, entitled "Chemical Tests and the Law," published by Northwestern University in 1957, the author states at page 60:

"There also have been challenging situations in several of the cases involving blood tests. One of the most important factors in direct analyses of specimens of blood is the protection from contamination of the specimen at the time of taking,

7

during transportation to the chemist, and at the time of analysis. The attorney offering chemical test evidence must be able to show proper protection of the specimen within recognized standards from the time the needle was inserted into the flesh of the subject person until the chemist arrived at his ultimate conclusion after the analysis."

In Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257, the Supreme Court of Virginia holding that the results of a blood test should have been excluded stated:

"Such an analysis is important evidence in a trial of this sort, and care must be exercised to establish the essential links in the chain of evidence relied on to identify the blood analyzed as being the blood taken.

". . . It is rudimentary that a specimen taken from a human body for the purpose of analysis must be identified before such specimen or any analysis made from it attains standing as evidence of the condition of the person whose conduct is questioned. Without identification, there is no connection between the two."

In People v. Sansalone, 208 Misc. 491, 146 N.Y.S.2d 359, the sole question involved was the admission into evidence of the testimony of a chemist showing the alcoholic content of a specimen of blood taken from defendant. The defendant contended that the specimen was not properly identified; that the testimony did not show that it had been in the continuous and exclusive custody of the police from the time it was taken until delivered to the chemist, and that there was no evidence that the specimen at the time it was analyzed was in the same condition as when extracted from de-

fendant. The testimony introduced showed that the blood was taken by a doctor and given to a policeman, who gave it to another policeman who took it home and put it in his refrigerator. The mother of the latter policeman gave it to another policeman who took it to the chemist. The mother did not testify and there was no showing as to the condition of the specimen at the time of delivery to the third policeman.

The court ruled that the failure of the mother to testify that the specimen she gave to the third policeman was the one that the second policeman brought home was a missing link in the chain of identification and in its opinion holding that the trial court erred in admitting the testimony of the chemist showing content of the specimen, the court stated:

> "Identity and unchanged condition must be first established before a specimen can be allowed in evidence and hence it was improper in this case to receive the chemist's testimony or his report in evidence.
>
> "Blood specimens to be used as evidence in trials such as this should be handled with the greatest of care and all persons who handle the specimen should be ready to identify it and testify to its custody and unchanged condition."

The testimony offered in the instant case fails to definitely establish and leaves to speculation the identity of the person or persons who took the blood specimen from the refrigerator in the Moline Public Hospital Laboratory and delivered it to the chemist in the laboratory in St. Luke's Hospital in Davenport, Iowa. Mrs. Rietus, the secretary to whom Park addressed the note advising that the Woolley blood specimen had been placed in the refrigerator to be picked up and delivered to the laboratory in St. Luke's Hospital in Davenport, Iowa, was not called to identify

9

the person who removed the blood from the refrigerator in the Moline Public Hospital Laboratory for delivery to the laboratory in St. Luke's Hospital. The record is silent as to who had access to the refrigerator in the laboratory of the Moline Public Hospital where the blood specimen was placed and remained over night. The appellant contends that the refrigerator was inaccessible to third persons but this contention is not supported by the evidence. The evidence in the record is that the refrigerator was under the sole supervision and control of the Quad-Cities Pathologists Group, but there is nothing in the record indicating who had access to the refrigerator from the time the specimen was placed in the refrigerator by Park until it was picked up the next morning. No evidence was offered to establish the unchanged condition of the blood specimen from the time of the taking until the analysis. The bottle and label offered in evidence were not the original bottle and label used in containing and transmitting the blood specimen and no evidence was offered to explain why the original bottle and label were not available. Where the substance analyzed has been handled by several persons, the evidence must not leave it to conjecture as to who handled it and what was done with it between the taking and the analysis.

██ A blood specimen is something that could be conceivably tampered with and for that reason if the analysis of a blood specimen is to be offered and admitted in evidence on the issue of intoxication, extreme caution should be used in handling the specimen. The custody of the specimen should be accounted for from the time of the extraction to the analysis and the unchanged condition of the specimen from the time of the taking to the analysis should be established. In the absence of such a showing, a blood analysis is not competent and admissible in evidence.

10

■ We conclude that the evidence in this case fails to establish the essential links in the chain of evidence to properly identify the blood specimen which was analyzed as being the blood taken from the body of Woolley and that the trial court correctly refused the admission of the blood analysis in evidence.

■ ■ The Plaintiff next contends that the trial court erred in refusing to give Plaintiff's tendered Instruction No. 8 which is as follows:

"A person is 'intoxicated' who is so far under the influence of alcoholic liquors that his faculties are impaired to such an extent that he fails to use that normal degree of attention and care in his conduct which he otherwise would use."

What does or does not constitute intoxication within the meaning of the Dram Shop Act is a question of fact for determination by the jury. Shea v. LaCost, 16 Ill.App.2d 454, 148 N.E.2d 484; Shorb v. Weber, 188 Ill. 126, 58 N. E. 949. Plaintiff's tendered Instruction No. 8 was properly refused by the trial court.

It is next contended that the trial court erred in giving Defendant's Instruction No. 18-A submitting a special interrogatory to be answered by the jury. Since the interrogatory was returned not answered, it is not necessary for this court to consider this question.

For the reasons given, the judgment of the Circuit Court of Rock Island County is affirmed.

Affirmed.

CROW, P. J. and SPIVEY, J., concur.