Clifford Navarro, et al., Plaintiffs-Appellees, v. Harry Lerman and Martin Lerman d/b/a 430 Club, and Sam Goldfarb, et al., Defendants-Appellants. On the Appeal of Martin Lerman, et al., Defendants-Appellants.

Gen. No. 49,160.

First District, Third Division.

April 23, 1964.

Brody & Gore, and Robert B. Johnstone, all of Chicago, for appellants.

Gilford & Crifase and Morton A. Resnick, all of Chicago, for appellees.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

This case was brought under the Dram Shop Act (Ill Rev Stats 1955, c 43, § 135) to recover damages

27

for personal injuries sustained by the plaintiff Clifford Navarro, who was stabbed by Willie Tooles while the latter was allegedly intoxicated. The jury returned a verdict of $3,000 and judgment for that amount was entered against the defendants Martin Lerman, the operator, and Sam Goldfarb, the owner, of a tavern located at 430 East 43rd Street, Chicago, where Tooles purchased the liquor which caused his intoxication. The assignments of error are that the verdict was contrary to the manifest weight of the evidence and that an incorrect instruction was given to the jury.

Navarro and his wife and Tooles and his wife lived in apartments above the tavern. They had been friends for years. On April 4, 1955, about 10:00 p. m., Navarro went upstairs to the Tooles' apartment and rang the bell. According to Navarro, Tooles opened the door with a knife in his hand, asked what Navarro wanted, cursed, told him to go away and closed the door. As Navarro started down the stairs, Tooles reopened the door, ran out, lunged at him, and cut him on the head and in the upper abdomen with a switchblade knife. Tooles then kicked him, knocked him down, got on top of him, choked him with his left hand and attempted to stab him again with his right. Navarro grabbed the hand that held the knife and twisted it until the knife fell; he then seized the knife and stabbed Tooles on the shoulder and in the back. Tooles died from the stabbing; Navarro was hospitalized for six or seven weeks.

The evidence as to Tooles' intoxication was as follows: Harry Lerman, the manager and bartender of the tavern, which was called the "430 Club," said that on April 4th Tooles was in and out of the tavern during the day and night and was drinking with William McClaine and other people, and at one time with Navarro. On cross-examination he said he assumed Navarro was drinking but did not see him do so.

28

McClaine testified that he and Tooles got together about two o'clock that afternoon; that from 2:00 to 8:30 p. m. Tooles bought three and a half pints of whiskey at the 430 Club and consumed about two pints, that Tooles was drunk at 8:00 p. m., but he bought another pint at the same place about 9:00 p. m. and was drunk when Navarro came to the door. Prior to Navarro's arrival, Tooles had struck his wife with a hammer and thereupon McClaine said he was leaving; he did so just as Navarro arrived; he heard no argument and he did not witness the stabbing. In a statement to the police after the occurrence, McClaine had said that Tooles had been drinking whiskey, but that he was not drunk. He also had said that there had been an argument between Tooles and Navarro in which Navarro took the side of Tooles' wife and Tooles had said: "It looks like you are going against me."

Navarro testified that Tooles and his wife came to his apartment on the morning of April 4th and drank coffee and a pint of whiskey while he drank beer. He said he did not see Tooles again until he went to their apartment. He denied drinking with him at the 430 Club or being in it that day.

Mrs. Navarro testified that her husband drove her home from work after 7:00 p. m.; thereafter, as she left her apartment to visit her sister who was sick, she met Tooles and McClaine at the front door. She saw Tooles come out of the 430 Club with a half pint of whiskey and saw him turn the bottle up and drink out of it. She said he was intoxicated. Later on after returning home, she heard Tooles swearing and what she thought was fighting between him and his wife. She went up the stairs and found her husband leaning against the wall with blood gushing from him. She carried him downstairs to McClaine's auto, got Mc-

29

Claine out of the 430 Club and called the police. McClaine took him to a hospital.

The only contrary evidence about Tooles' intoxication was the testimony of the police officer who investigated the stabbing. He said that he did not smell alcohol on Tooles' breath and that in his opinion he had not been drinking.

It is obvious that the verdict cannot be said to be against the manifest weight of the evidence—unless, as suggested by the defendants, the testimony in behalf of the plaintiff is completely discounted. The defendants insist that this is exactly what should be done because, they say, the plaintiff and his witnesses were discredited, their testimony was inherently improbable and was patently tailored to take advantage of Tooles' death. They point out that Mrs. Navarro had said in a deposition that she had been in the 430 Club for a few minutes that day, and in her testimony she said she had not; that the bartender testified Navarro had been there too; that the history Navarro gave of his work record was inaccurate, in one respect, and that McClaine's statement to the police differed from his testimony in court, in the two respects previously mentioned. They argue that the whereabouts of Navarro prior to the stabbing is not shown and that more likely than not he was in Tooles' apartment and brought on the attack by provoking his longtime friend; they argue further that McClaine's testimony that he rushed out of the apartment and did not see the stabbing is improbable.

The discrepancies in the testimony of Navarro and his wife were comparatively minor. Whether Navarro or his wife had been in the tavern were questions of fact for the jury. No one, including counsel for the defendants, asked Navarro where he had been immediately prior to the altercation and McClaine's testimony that he did not see the stabbing, while it may

30

be questionable, is not inherently improbable. It must be remembered that Mrs. Navarro found him in the tavern after she had taken her husband to his car.

The testimony as to the occurrence was uncontradicted, except insofar as McClaine was impeached by his statement to the police concerning words between Tooles and Navarro preceding the occurrence. The testimony as to Tooles' consumption of whiskey was contradicted only by the police officer who saw the dying Tooles and who said that in his opinion Tooles had not been drinking. The defendants argue that the plaintiffs' evidence as to intoxication should be discarded and the testimony of the officer accepted "as the sole believable testimony in the case." This was for the jury to decide. It was the jury's province to consider the testimony, the extent to which the plaintiff and his witnesses had been discredited and the extent to which they or the police officer should be believed. In appraising the testimony of the officer, the jury could well have weighed his opinion against the knowledge of another witness for the defense, the bartender, who saw Tooles drinking that day and that evening.

It was the jury's responsibility to decide all controverted questions of fact. The jury resolved these questions in favor of the plaintiff; its verdict was supported by substantial evidence and certainly was not against the manifest weight of the evidence.

■ ■ The instruction which is urged as reversible error is one defining intoxication and was taken from Illinois Pattern Instructions (IPI 150.15). It is as follows:

> "A person is 'intoxicated' when as a result of drinking alcoholic liquor there is an impairment of his mental or physical faculties so as to diminish his ability to think and act with ordinary care."

31

By preparing and recommending the use of an instruction on intoxication, the Illinois Supreme Court Committee on Jury instructions took a position contrary to the prior decisions of our reviewing courts. Because the court in the present case followed the committee's recommendation rather than the prevailing law, it becomes necessary for us to re-evaluate the rule which has obtained in our State from the first decision on the subject in 1899 through the last one in 1960.

Instructions defining intoxication, in terms not too unlike the present one, have been condemned in a series of dramshop cases in our state. In Tipton v. Schuler, 87 Ill App 517 (1899), the court held that the trial court erred in giving an instruction which said that before the plaintiff could recover she had to prove that the allegedly inebriated person,

> ". . . was so under the influence of intoxicating liquor that his judgment, memory and reasoning was impaired to such an extent that he did not know the natural and reasonable consequences of his own act. . . ."

The court stated:

> "The degree of intoxication necessary for recovery is essentially a question of fact; and an instruction which attempts to settle or comprehend the state of intoxication necessary in order to fix the liability of the defendant is clearly foreign to the province of the judge presiding."

The Supreme Court made this comment in Shorb v. Webber, 188 Ill 126, 58 NE 949 (1900):

> "We know of no terms which could safely be incorporated in an instruction defining intoxication. . . . We think when the court informed this jury

that the evidence must prove that the deceased was *intoxicated,* it did all the law required."

In Shea v. LaCost, 16 Ill App2d 454, 148 NE2d 484 (1958), the given instruction differed from the one in Tipton v. Schuler, in that it told the jury what did not constitute intoxication. The court held the instruction erroneous saying:

"What does or does not constitute intoxication within the meaning of the Dramshop Act is a question of fact for determination by the jury.

". . . .

"Defendants' instruction . . . is bad because it attempts to settle the degree of intoxication necessary in order to fix liability and this essentially is a question of fact for determination by the jury."

The last case on the subject is Wooley v. Hafner's Wagon Wheel, Inc., 27 Ill App2d 1, 169 NE2d 119 (1960). The court cited Shorb v. Webber and Shea v. LaCost in holding that the trial court was correct in refusing to give plaintiff's tendered instruction No 8, which was as follows:

"A person is 'intoxicated' who is so far under the influence of alcoholic liquors that his faculties are impaired to such an extent that he fails to use that normal degree of attention and care in his conduct which he otherwise would use."

The court observed:

"What does or does not constitute intoxication within the meaning of the Dram Shop Act is a question of fact for determination by the jury. . . . Plaintiff's tendered Instruction No 8 was properly refused by the trial court."

Leave to appeal was granted by the Supreme Court. Between the date of the Appellate Court opinion in September 1960 and the date of the Supreme Court opinion in May 1961, the Illinois Pattern Jury Instructions were submitted and the Supreme Court adopted Rule 25–1, effective as of February 1, 1961, which provided in part as follows:

> "(a) Whenever Illinois Pattern Jury Instructions (IPI) contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law."

Two contentions of the plaintiff were considered in the appeal (22 Ill2d 413, 176 NE2d 757). The court sustained one of these and reversed and remanded the case because of it. In reference to the second contention, the disputed instruction, the court said:

> "The contention of the plaintiff that the trial court erred in refusing to give plaintiff's tendered instruction No 8, which instruction seeks to define intoxication under the Liquor Control Act, will not be passed upon by this court. A new trial of this cause will be necessary, and the plaintiff's tendered instruction is different from instruction 150.15, Ill Pattern Jury Instructions, Civil, which defines 'Intoxication.' (IPI No 150.15) Upon a new trial, instructions will be given in accordance with Supreme Court Rule 25–1."

From this observation, the plaintiff in the present case infers that the Supreme Court would approve the giving of an instruction on intoxication if the instruction were correctly drawn. We believe the in-

34

ference is justified. We too would infer that the court refused to rule on the instruction not because it felt that any instruction on the subject of intoxication was improper, but because it would have been useless to comment on the language of the tendered instruction inasmuch as the Wooley v. Hafner's case had to be retried and in the new trial a different instruction, IPI No 150.15, would be given.

The reasons heretofore advanced for rejecting instructions defining intoxication in dramshop cases are that there are degrees of intoxication and intoxication varies among individuals; that one drink of an alcoholic beverage may intoxicate one person, while several drinks may not intoxicate another; therefore, what is intoxication is a question of fact which should be left to the jury. On the other hand, a different view was expressed in the criminal case of People v. Schneider, 362 Ill 478, 200 NE 321. In that case one of the questions was whether the defendant, who was indicted for manslaughter while driving a motor vehicle, was intoxicated at the time he was driving his car. The defendant tendered an instruction defining intoxication which the trial court refused. The Supreme Court said that because of the different ideas persons had as to the meaning of the term "intoxication" that if it was left undefined,

> ". . . it would be such as to make the matter of guilt or innocence of a defendant entirely one of caprice. Whether or not a person is intoxicated is a question of fact for the jury, but what constitutes intoxication is a question of law to be defined by the court."

We agree with the principle stated in the last sentence and we also agree with the opinion of the Committee on Jury Instructions, as expressed in its comments concerning instruction 150.15:

35

"Since intoxication is the crux of a dram shop case just as negligence is the crux of most personal injury suits, it would seem that a definition of intoxication is just as important as a definition of negligence in a civil case."

We hold that an instruction defining intoxication is proper in a dramshop case and we further hold that IPI No 150.15 is a good definition of a term which is difficult to accurately define.

In the present case there was substantial evidence that Tooles was intoxicated and there was undisputed evidence that he obtained the liquor which caused or contributed to his intoxication at the 430 Club. The trial court carefully instructed the jury that before the plaintiff could recover he had to prove that Tooles was intoxicated at the time of the altercation with Navarro and that his intoxication was at least one cause of the occurrence in question. This was a proper case for the use of an instruction on intoxication and the court did not err in giving IPI No 150.15 to the jury. The judgment is affirmed.

Affirmed.

SCHWARTZ, P. J. and SULLIVAN, J., concur.