**Alexandria**

LORI DOTSON

v.

ROBERT M. PETTY, JR.

No. 1341-85

Decided July 7, 1987

COUNSEL

Donald P. McDonough (Legal Services of Northern Virginia, Inc., on brief), for appellant.

Patricia W. Drain (Drain & Cohen, on brief), for appellee.

OPINION

**DUFF, J.** — Lori Dotson appeals the judgment of the trial court that dismissed her petition for child support on the ground that she did not establish the chain of possession of the parties' blood samples. Specifically, the court held that the human leukocyte antigen (HLA) blood test results were inadmissible because Ms. Dotson failed to identify the courier who transported the blood to the laboratory for testing. Based upon our review of the record, we find that the chain of possession of the blood samples was properly established. Accordingly, we reverse the decision of the trial court.

On April 15, 1985, Ms. Dotson filed a petition for child support in juvenile and domestic relations district court, alleging that Robert M. Petty, Jr. was the father of her son. Prior to the filing of the petition, the parties voluntarily submitted to HLA blood testing. The test results tendered in juvenile court showed a 98.5% probability that Mr. Petty was the child's father, but the court found that Ms. Dotson failed to establish the chain of possession of the blood samples.

The appeal to the circuit court was heard on September 19, 1985. Ms. Dotson presented detailed evidence regarding the steps taken in the drawing and packaging of the blood samples. She provided the testimony of Regalina Lanuzo, the medical technician who drew the blood from Ms. Dotson and her child on April

1, 1985, at the Roseway Medical Laboratory in Arlington, Virginia. Ms. Lanuzo stated that she identified Ms. Dotson by checking her license and that she took pictures of Ms. Dotson and her son, which she attached to a client authorization sheet. Ms. Lanuzo also testified that after she drew the blood from Ms. Dotson and the child, she wrote their names on the vials, the date the blood was drawn, and her initials. She stated that the vials were then packaged in a container that was put into a cardboard sleeve and sealed at each end with green adhesive tape. At trial, Ms. Lanuzo examined the cardboard sleeve and identified her signature that she had placed in two locations so that the writing appeared partly on the sleeve and partly on each of the two pieces of green tape. Finally, Ms. Lanuzo testified that the package was placed in a locked paternity room in the laboratory at 2:25 p.m. and that it was picked up by a courier from the Roche Biomedical Laboratory at about 3:00 or 3:30 p.m.

Kathryn Keviatec testified that she was an employee of the Richland Laboratory[1] in North Carolina and that she received the sealed cardboard sleeve containing the blood vials of Lori Dotson and her child sometime before 6:00 a.m. April 2, 1985. She stated that the sleeve was delivered to her locked forensic box at the laboratory and that she possessed the only key to the box. At trial, Ms. Keviatec identified the sleeve and testified that when she received the sleeve, it was intact and initialed across the seals, that there were no signs of tampering, and that she wrote these facts on the client authorization sheet that was enclosed in the sleeve. Next, she stated that she unpackaged the sleeve and attached individual specimen identification numbers to the blood vials and to the cardboard sleeve in which the vials were transported. She further testified that these identification numbers followed the blood vials throughout all phases of testing. After performing certain red cell fino typing tests, Ms. Keviatec stated that she hand carried the blood vials to Charles Carrico, a supervisor of the paternity department of the laboratory, whose duties included the management of the quality control records, the oversight of laboratory procedures, and the running of the HLA tests.

---

[1] It is not clear from the record whether the Richland Laboratory is a branch division of the Roche Biomedical Laboratory. However, the parties referred to Kathryn Keviatec as an employee of the Roche Laboratory, and we assume the accuracy of this representation for purposes of this opinion.

The putative father's blood sample was drawn by George Hamilton, a phlebotomist who worked for the Roche Biomedical Laboratory. His testimony, offered into evidence through a *de bene esse* deposition, indicated that he drew blood from Mr. Petty on March 26, 1985, that he identified Mr. Petty by his Colorado driver's license, and that he took a photograph of Mr. Petty, which he identified at the deposition.

Mr. Hamilton stated that he wrote Mr. Petty's name, the date, and his initials on Petty's blood vial and that he placed the vial in a styrofoam container and sealed it with two pieces of scotch tape. He testified that he inserted the container into a cardboard sleeve, sealed the sleeve on both ends with green HLA stickers, and signed the stickers on each end so that part of each signature appeared on the cardboard sleeve and on the green sticker. Mr. Hamilton identified the cardboard sleeve that he used and further testified that after he sealed the sleeve, he placed it on a cabinet beside his desk. The cabinet was in a secured area that had only one door, kept locked, through which people could enter. He also indicated that the cardboard sleeve was placed into a large shipping box, sealed with heavy gauge tape, and picked up later in the afternoon by a courier for the Roche Biomedical Laboratory.

Donna Rich, an employee of the Roche Biomedical Laboratory in North Carolina, testified that on March 27, 1985, she picked up the cardboard sleeve containing Mr. Petty's blood from her forensic box in the North Carolina laboratory. She stated that this box was always securely locked and that it held the specimens transported by the couriers from the airport or the company plane. Ms. Rich also testified that the cardboard sleeve showed no signs of tampering and that it was taped and initialed by George Hamilton. She further stated that she labeled Mr. Petty's blood vial with an identification number, placed the number on the cardboard sleeve, made a worksheet, ran the red cell tests, and hand carried the blood vial to Charles Carrico, the HLA technician.

Dr. G. L. Ryals, the director of the Department of Paternity Evaluation at the Roche Biomedical Laboratory, was qualified and accepted as an expert on behalf of Ms. Dotson. After he testified about the purpose of HLA blood testing, Ms. Dotson attempted to qualify Dr. Ryals as a custodian of the laboratory business records. However, the trial court sustained an objection to this testimony, finding that it was premature because the chain of

possession of the blood samples had not been adequately established. When Ms. Dotson offered the testimony of two paternity department supervisors, John Carrico and John Baxter, the court also sustained Mr. Petty's objections, holding that there were missing elements in the chain of possession. Regarding an objection to Mr. Baxter's testimony, the court stated, "You have to have him testify as to how they got there and that type of thing." Ms. Dotson then conceded that she could not produce the courier who transported the blood from Northern Virginia to North Carolina. The court sustained Mr. Petty's objection to the admissibility of the blood tests and granted his motion to strike because Ms. Dotson did not produce the courier who transported the parties' blood samples. We reverse the trial court's determination that the chain of possession had not been properly established.

It is uncontroverted that Ms. Dotson was required to prove beyond a reasonable doubt that Mr. Petty was the father of her child. *See* Code § 20-61.1; *Jones v. Robinson*, 229 Va. 276, 287, 329 S.E.2d 794, 800 (1985); *Lawrence v. Bluford-Brown*, 1 Va. App. 202, 203-04, 336 S.E.2d 899, 900 (1985). A party may establish paternity by offering into evidence the "[r]esults of medically reliable genetic blood grouping tests, which tests may include the human leukocyte antigen (HLA) test." Code § 20-61.1(5). At the time of the proceedings in this case, Code § 20-61.2 provided that "the results of. . .[HLA tests] shall be admitted in evidence when offered by a duly licensed and certified practicing physician or other qualified scientist."[2] One who seeks to admit the results of a blood test must "establish the essential links in the chain of evidence relied on to identify the blood analyzed as being the blood taken." *Rodgers v. Commonwealth*, 197 Va. 527, 531, 90 S.E.2d 257, 259 (1955). The party offering the evidence

---

[2] By amendment effective October 1, 1985, Code § 20-61.2 was revised as follows: The results of. . .[HLA tests] shall be admitted in evidence when contained in a written report prepared and sworn to by a duly licensed and certified practicing physician or other qualified scientist, provided the written results are filed with the clerk of the court hearing the case at least fifteen days prior to the hearing or trial. Any physician or scientist performing such tests outside of Virginia shall consent to service of process through the Secretary of the Commonwealth by filing with the clerk of the court the written results. Upon motion of any party in interest, the court may require the person making the analysis to appear as a witness and be subject to cross-examination provided that the motion is made within seven days prior to the hearing or trial.

*See* 1985 Va. Acts ch. 488.

must establish with reasonable certainty that there has been no alteration or substitution of the blood. *Robinson v. Commonwealth*, 212 Va. 136, 138, 183 S.E.2d 179, 180 (1971). The Supreme Court further explained that "[t]he requirement of *reasonable certainty* is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received." *Id.* (quoting *People v. Riser*, 47 Cal. 2d 566, 580-81, 305 P.2d 1, 10 (1957)) (emphasis in original). Although the party offering the evidence need not rule out all possibility of tampering, "where the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to who had it and what was done between the taking and the analysis." *Rodgers*, 197 Va. at 531, 90 S.E.2d at 259.

In *Rodgers*, the Court held that the trial court erred in admitting the results of a blood analysis into evidence without sufficient identification that the blood was that drawn from the defendant:

> [A] sample of the defendant's blood was taken on the night of December 2, 1953, according to standard procedure, and that it was put into two tubes which were sent to Abingdon, according to the best impression of the technician. Whether and how these tubes were labeled was not established. When and by whom they were mailed is not definitely shown. If sent to Abingdon, the evidence does not show who received them there, or how and by whom they were forwarded to Richmond. At some time not shown to the jury a sample of blood "which bore the name of the defendant" was analyzed by Dr. Kaye. When it had been received, in what it had been contained, by whom and in what manner the defendant's name appeared, the evidence does not disclose. Neither container nor labels were produced at the trial.

197 Va. at 530, 90 S.E.2d at 259.

A chain of possession problem also was presented to the Virginia Supreme Court in *Robinson v. Commonwealth*, 212 Va. 136, 183 S.E.2d 179 (1971). In that case, the Commonwealth attempted to introduce a rape victim's panties, blouse, and a sample of pubic hair. The police officer in charge of the property room testified that he received from a nurse the victim's panties and an envelope containing some pubic hair, and that he received the vic-

tim's blouse from another police officer. He then sealed and delivered the items to the police laboratory for analysis. Neither the nurse nor the other police officer testified. The Court found that there was no evidence of what was done with the items from the time they were taken from the victim to the time they were delivered to the property officer. Thus, the Court determined that the Commonwealth failed to establish a vital link in the chain of possession because the Commonwealth was unable to show with "reasonable certainty" that the proffered exhibits were in the same condition at the time they were analyzed as when they were originally received. *Id.* at 138, 183 S.E.2d at 180. The Commonwealth also failed to show that the pubic hair taken from the victim was the same hair that was analyzed. *Id.* at 138, 183 S.E.2d at 180-81.

In the present case, the vital links in the chain of possession of the blood samples were well established by the evidence. The testimony of the witnesses set forth the extensive procedures for identifying, packaging, and securing the blood. These procedures included the client authorization and identification forms and the method for inspecting the packages as they were received by Roche Laboratories, Inc.

The record revealed that after the blood was drawn from the parties, each blood sample was labeled, packaged, sealed, and properly addressed. Although the blood samples did not possess "characteristics which [were] fairly unique and readily identifiable," the sealed packages in which the samples were placed were unique and identifiable. *See Whaley v. Commonwealth,* 214 Va. 353, 357, 200 S.E.2d 556, 559 (1973) (quoting *McCormick's Handbook of the Law of Evidence* § 212 (2d ed. 1972)). The record shows that Dotson's and her child's blood sample were placed in a locked room and that Petty's blood sample was put in a secured area until they were picked up by the courier. The testimony established that the packages arrived intact at Roche Laboratories in Burlington, North Carolina the day after the blood had been drawn and packaged, with no evidence of tampering. The fact that the courier was not identified, or called as a witness, does not make it as likely as not that the blood analyzed was not the blood drawn. *Robinson,* 212 Va. at 138, 183 S.E.2d at 180. The failure to call the courier to testify did not create a missing vital link in the chain of possession. The evidence in this case regarding

the method of packaging, the securing of the packages in the offices until the courier pick-up, the receipt of the packages in the laboratory's locked boxes, and the affirmative inspection of packages for tampering obviated the need to call the courier as a witness because the evidence did "not leave to conjecture . . . who had [the samples] and what was done with [them] between the taking and the analysis." *Rodgers v. Commonwealth*, 197 Va. 527, 531, 90 S.E.2d 257, 260 (1955). The procedures employed negated any substantial probability that the blood samples had been altered, substituted, or tampered with during transit, thereby sufficiently accounting for that link.

Under the facts and circumstances of this case, we hold that Ms. Dotson's evidence demonstrated with reasonable certainty that there was no alteration or substitution of the blood samples and that every vital link in the chain of possession was accounted for. Therefore, the results of the tests were admissible in evidence, and the trial court erred in excluding them. Accordingly, we reverse and remand for a new trial.

*Reversed and remanded.*

Benton, J., and Keenan, J., concurred.