McMILLAN, Judge.
The appellant was convicted of manslaughter, in violation of § ISA-6-3, Code of Alabama 1975, and of assault in the first degree, in violation of § 13A-6-20, Code of Alabama 1975. She was sentenced to 15 years’ imprisonment on the manslaughter conviction and to 12 months’ imprisonment on the assault conviction. After considering the appellant’s probation application, the trial court ordered the appellant’s sentence to be split, so that she would serve a 2-year sentence as a condition precedent to a 5-year probationary period.
On March 28, 1991, at approximately 6:30 p.m., the appellant, while driving her car, was involved in an automobile accident, in which the driver of the other vehicle, Teena West, was killed and West’s son, Casey, was seriously injured. Based on the suspicions of paramedics at the scene of the accident and the personal observations of State Trooper Doug Rinehart, who investigated the wreck and who observed the appellant’s demeanor, the appellant was arrested for driving under the influence of alcohol. That charge was later dropped and the appellant was indicted for murder. The jury found the appellant guilty of the lesser included offenses of manslaughter and assault.
I
The appellant argues that the trial court erred in allowing the prosecutor to present evidence regarding a mathematical conversion of his “blood plasma” alcohol content to “whole blood” alcohol content. She argues that “the introduction of this pseudo-scientific testimony led to a de facto presumption by the jury that she was legally intoxicated’ and, thus, criminally culpable.” She further argues that the “blood plasma” test has never been recognized in this state under the test enunciated in Frye v. United States, 54 App.D.C. 46, 293 F. 1013 (1923), which was adopted by the Alabama Supreme Court in Ex parte Dolvin, 391 So.2d 677 (Ala.1980).
An examination of the record reveals the following pertinent facts. Dr. Perry Lovely, a physician working in the emergency room at Druid City Hospital on the night of the accident, testified that, on March 28,1991, he treated the appellant for injuries she received as the result of an automobile accident. He testified that her injuries were minor, with the exception of a severely fractured ankle that might possibly require surgery. Dr. Lovely testified that because the appellant was unruly and had the smell of alcohol on her person, he ordered, for medical reasons, a blood alcohol test in case surgery was required. The blood sample, which was drawn approximately 2 hours after the accident, was sent to the toxicology lab where a “blood plasma” test was performed. Ron Setzer, a lab technician, testified that, after separating the blood in the centrifuge, he tested the blood plasma for alcohol content, using a gas chromatograph, which returned a result showing the appellant’s blood plasma alcohol to be .25 percent.
The record reveals the following colloquy between the trial court, the jDrosecutor, and defense counsel, concerning Mr. Setzer’s testimony:
“[DEFENSE COUNSEL]: Yoúr Honor, that — and this is particularly damaging because this figure looks a lot worse than it is, or could be, or might be. It has no direct relationship with how much blood— how much alcohol was in her blood because it depends on what was taken out in the blood plasma.
“THE COURT: Well, let me ask the witness this: Are you saying that test you performed is or is not an accurate means of determining the blood alcohol content of an individual?
“THE WITNESS: I think it is the most accurate test available is gas chromatography and I think most people think that plasma alcohol is better than blood alcohol. But, unfortunately, you know, whatever, *295 the state statutes usually are based on whole blood. But I have read that there is a little slight difference, but I wouldn’t think it would be thirty-five percent. But I don’t know, so I can’t say that.
“THE COURT: Well, Jerry, I think this may affect how we charge the jury, but I don’t think it is going to affect the admissibility because the witness has testified that it’s an accurate method of testing the blood.
“[DEFENSE COUNSEL]: Of testing the blood plasma, yes, sir.
“THE COURT: Of determining blood alcohol content. That is just what I just asked him and what he responded to. And I think your objection is going to go to the weight that is to be given by the jury but it is not going to make it inadmissible.
“[DEFENSE COUNSEL]: I would object, then, now, and I would like a continuing objection to any mention of this sample under [§ 32-5A-194] as indicating, again, that the alcohol shall be based upon grams of alcohol per one hundred cubic centimeters of blood, that that is what I expect people to be talking about here. I expect that — I do expect the state to try to bootstrap themselves into — into being able to use this figure, but I don’t — I believe that they will be able to, Your Honor. That—
“THE COURT: Well, so far as applying the statute to this test, I think you’re correct and I think they will probably have to be charged something to that effect, to explain to them.
“[DEFENSE COUNSEL]: Sir, but, again, what I am saying is that — So you’re saying you’re going to admit it showing there was alcohol in there but not for the purpose of showing that she was legally intoxicated?
“THE COURT: I am going to admit it showing the test but, so far as the statute, I don’t think the statute would apply to it and I will be glad to look at the requested charges to that effect.
“[DEFENSE COUNSEL]: We are going to need to move on. It is getting about lunch time.
“May I have a ruling on my objection? “THE COURT: Overruled.
“Yes, sir.”
Trooper Rinehart then testified that subsequent to the “blood plasma” test, he arrived at the hospital and arrested the appellant. The appellant signed a consent form for a second sample to be drawn. That sample was drawn approximately four hours after the wreck occurred. The blood sample was given to Rinehart for chemical analysis of the Alabama Department of Forensic Sciences. Alan Lee, a forensic scientist, analyzed the whole blood sample, using a gas chromato-graph, which revealed the appellant’s blood alcohol content to be .167 percent. Dr. Jack Kalin, head of the forensic sciences lab, testified over strenuous objection by defense counsel that a fair and scientifically reasonable mathematical translation of the blood plasma figure would result in an equivalent whole blood reading between .185 and .217 percent.
The trial court orally charged the jury regarding intoxication as follows:
“Now, ladies and gentlemen, Alabama law provides that if there is at the time of the alleged offense .10 percent or more by weight of alcohol in the defendant’s blood, it shall be presumed that the defendant is under the influence of alcohol. However, this presumption is a rebuttable presumption and you are to consider that evidence along with all of the other competent evidence in the case in determining whether the State of Alabama has proved beyond a reasonable doubt that the defendant was driving under the influence of alcohol at the time of the alleged offense in this case.
“Now, I further charge you that blood plasma is not whole blood. There has been evidence in this case of a blood plasma alcohol percentage. You are instructed that you cannot apply the presumption that I have just given you as to the blood plasma alcohol percentage. However, you may consider this evidence on the issue of whether or not the defendant was intoxicated at the time of the accident. The weight to be given this admitted evidence is for you the jury, to determine.”
In reviewing the record, we agree with the trial court that § 32-5A-194, Code of Alabama 1975, does not provide for the admissi *296 bility of tests measuring the alcohol content of blood plasma. Specifically, § 32-5A-194(a)(5) provides:
“Percent by weight of alcohol in the blood shall be based upon grams of alcohol per 100 cubic centimeters of blood or grams of alcohol per 210 liters of breath.”
See Ex parte McCall, 596 So.2d 4 (Ala.1992) (fundamental rule of statutory construction is to ascertain and give effect to intent of legislature in enacting the statute); Powers v. State, 591 So.2d 587 (Ala.Cr.App.1991) (Court of Criminal Appeals is required to ascertain and effectuate the intent of the legislature as set out in the statute).
Last, although the State presented expert testimony that the blood plasma test was an accurate and scientifically reliable means of measuring blood alcohol content, we preter-mit any discussion of the test’s applicability under Frye and Ex parte Dolvin, because a second blood test was administered that conformed to the statute. Therefore, any error in the introduction of the “blood plasma” test would be, at most, harmless. Rule 45, A.R.App.P. See also Boyd v. City of Montgomery, 472 So.2d 694 (Ala.Cr.App.1985).
II
The appellant argues that the trial court erred in overruling his objection to the admissibility of the blood alcohol and blood plasma test results because, she says, the State failed to prove a proper chain of custody. Specifically she argues that the State failed to establish that the blood and blood plasma samples had not been tampered with, contaminated or altered.
In Brooks v. State, 599 So.2d 1238, 1241 (Ala.Cr.App.1992), this court stated:
“ ‘The State need only prove to a reasonable probability that the object is in the same condition as, and not substantially different from, its condition at the commencement of the chain. Sommer v. State, 489 So.2d 643, 645 (Ala.Cr.App.1986).’ McCray v. State, 548 So.2d 573, 576 (Ala.Cr.App.1988). ‘The evidence need not negate the most remote possibility of substitution, alteration, or tampering of the evidence.’ Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App.1981). We conclude that the State established a proper chain of custody.”
Additionally, in Moorman v. State, 574 So.2d 953, 955-56 (Ala.Cr.App.1990), quoting Suttle v. State, 565 So.2d 1197 (Ala.Cr.App.1990), this court held:
“ ‘With regard to specimens taken from the human body, it is also incumbent upon the prosecution to show that the specimen analyzed was in fact the specimen taken from the defendant. In such cases, “[t]he ‘chain of custody’ involves ‘the necessity of proving where and by whom the specimen was kept and through whose hands it passed.’ J. Richardson, Modern Scientific Evidence, Section 13.14a (2d ed. 1974).” Gothard v. State, 452 So.2d 889, 890 (Ala.Cr.App.), cert. stricken, 450 So.2d 479 (Ala.1984). See generally, A. Moenssens, F. Inbau & J. Starrs, Scientific Evidence in Criminal Cases § 1.18(2)(c) (3d ed. 1986). “[WJhere the substance analyzed has passed through several hands the evidence must not leave it to conjecture as to tvho had it and what was done ivith it between the taking and the analysis.” Rodgers v. Commonwealth, 197 Va. 527, 90 S.E.2d 257, 260 (1955) (emphasis added [in Suttle J).’”
See also Powell v. State, 515 So.2d 140 (Ala.Cr.App.1986).
Cynthia Willis, a nurse at Druid City Hospital, testified that she received the appellant into the emergency room for treatment. She testified that, under the instruction of Dr. Lovely, she withdrew blood from the appellant. Willis testified that she took the sample according to routine procedures, labelled and verified the sample, sealed it inside a plastic bag, and signed her name to the chain of custody label. Willis testified that the sample was in her exclusive possession until she personally handed it over to Kathy Smith, assistant supervisor of the emergency room laboratory. Smith testified that the blood sample was in her exclusive possession until she personally delivered it to Robert Maudlin, a lab technician.
Robert Maudlin testified that he received the sample, signed the chain of custody form, and carried the sample to the toxicology lab, *297 where he analyzed the sample by placing it in a centrifuge, a device which separates the components of blood. Maudlin testified that, after he allowed the sample to “spin” in the centrifuge, he turned it over to Ron Setzer, a lab technician, who assumed custody of the sample. Ron Setzer testified that he took the sample from Robert Maudlin and tested the blood plasma, and that the results indicated an alcohol content of .25.
Trooper Rinehart testified that the second blood sample taken from the appellant was drawn by a nurse, under the direction of Dr. Lovely. Rinehart testified that because of the late hour at which the second sample was drawn, he took the sealed sample home and stored it in his refrigerator. He testified that the sample was not tampered with in any way, and that he delivered it the following day to the forensic lab for analysis. Rinehart testified that he personally delivered the sample to Dr. Jack Kalin.
Dr. Kalin testified that, after he received the sample, he labelled and recorded it, and stored it in a secure facility accessible only to lab personnel until it could be analyzed.
Alan Lee, a lab technician, testified that he analyzed the sample of appellant’s blood and found the blood alcohol content to be .167 percent.
Thus, the evidence establishes that a sufficient chain of custody was proven for the admission of the blood samples into evidence.
Ill
The appellant argues that the trial court erred by denying his motion for a mistrial based on a witness’s nonresponsive answer that introduced the results of the blood plasma alcohol content test. That non-responsive answer and preceding question was as follows:
“Q [PROSECUTOR]: Based on your physical examination of her, based on solely your physical examination of her, do you have an opinion as to whether or not she was intoxicated?
“A. Based on her physical exam and the laboratory results, I made the diagnosis of intoxication.
“[DEFENSE COUNSEL]: Your Honor, may we approach the bench?
“THE COURT: Surely.
“(Whereupon the following was held at bench sotto voce:)
“[DEFENSE COUNSEL]: Your Honor, I move for a mistrial.
“[PROSECUTOR]: Judge, we would submit, first of all, that — number one, we don’t know till we find out what happens later, I would submit, till the end of the trial, whether we get the test in, first of all. Secondly, it can be cured by instruction.
“[DEFENSE COUNSEL]: We are going to strike that. There is no way to strike that from the jury’s mind. For the record, I said that very sarcastically.
“THE COURT: Well, I am going to instruct them to disregard it and also I will poll the jury to see if they would be able to disregard it.
“[DEFENSE COUNSEL]: I would point out, Your Honor, that, in so doing, all we are doing is we are underlining to them something that is highly prejudicial.
“THE COURT: Well, if he hadn’t have stated his opinion was—
“[DEFENSE COUNSEL]: Yes, sir.
“THE COURT: —no, he didn’t. He said I have an opinion but he didn’t state what that opinion was. The question — I guess we can look back, but we are getting real close. I am going to have to — I can’t be late.
“[DEFENSE COUNSEL]: Do you want to go over this in the morning?
“THE COURT: Well, are you going—
“[PROSECUTOR]: I don’t have any further questions.
“THE COURT: Let’s go ahead and excuse the — Let’s go ahead and excuse the witness at this time and we will just reconvene at nine in the morning.
“(In open court:)
“THE COURT: Any further questions of the witness?
“[PROSECUTOR]: No, sir.
“THE COURT: Okay. Mr. Lovely, you can be excused.
“THE WITNESS: Thank you.
*298 “THE COURT: Ladies and gentlemen, at this time I am going to instruct you to disregard the last answer given by the witness and we’ll talk to you a little bit more about that in the morning.
[[Image here]]
“(Pause. Jury not present:)
“THE COURT: He did say that based on — that he did make a diagnosis of intoxication?
“[DEFENSE COUNSEL]: Yes, sir.
“THE COURT: If the blood test comes in, then it would not be prejudicial. So I am going to wait and see if they get the blood test in. If they don’t get it in for any reason, then I will grant a mistrial.
“[DEFENSE COUNSEL]: Thank you, Your Honor.”
Because the trial judge, after hearing further evidence, properly ruled that the results of the blood plasma test were admissible, we find that no prejudicial error occurred here. Rule 45, A.R.App.P. See also Harrell v. State, 608 So.2d 434, 436 (Ala.Cr.App.1992), wherein this court held:
“It is a well-decided rule of this court that the granting of a mistrial is an extreme measure and should be taken only when it is manifestly necessary or when the ends of justice would otherwise be defeated. Hagood v. State, 588 So.2d 526 (Ala.Crim.App.1991), cert. denied, Martin v. Alabama, [ — ] U.S. [-], 112 S.Ct. 1943, 118 L.Ed.2d 548 (1992). Moreover, ‘the trial judge is allowed broad discretion in determining whether a mistrial should be declared because he is in the best position to observe the scenario, to determine its effect upon the jury, and to determine whether a mistrial should be granted.’ Garrett v. State, 580 So.2d 58 (Ala.Crim.App.1991).”
IV
The appellant argues that the trial court erred in denying his motion for a judgment of acquittal because, he says, the State’s evidence was insufficient to sustain her convictions.
In Kissic v. State, 594 So.2d 227, 228 (Ala.Cr.App.1991), this court held:
“The appropriate test to be applied to determine if a prima facie case has been made is ‘whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.’ Cumbo v. State, 368 So.2d 871, 874 (Ala.Cr.App.1978), cert. denied, 368 So.2d 877 (Ala.1979). It is not a requirement that evidence exclude every possibility of innocence. Payne v. State, 424 So.2d 722 (Ala.Cr.App.1982).
“When evidence is presented by the State in support of an indictment from which a jury could by fair inference find a defendant guilty, the case is properly submitted to a jury. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983). The weight of the evidence and inferences to be drawn therefrom are matters for the jury alone. Mosley v. State, 461 So.2d 34 (Ala.Cr.App.1984).”
In this case, State Trooper Rinehart testified that he arrived at the scene of the accident approximately 15 minutes after it had occurred. He testified that the appellant had slurred speech, bloodshot eyes, and a strong odor of alcohol on her person, and was generally incoherent. Additionally, he observed four empty beer cans in the appellant’s car. Rinehart testified that it was his professional opinion that the appellant was intoxicated at the time of the accident.
Two paramedics who had been called to the accident scene testified that the appellant was generally nonresponsive, possessed “slurred and slow” speech, had dilated pupils, and appeared to be “very drunk.”
Cynthia Willis, an emergency room nurse, testified that when she attempted to take a blood sample from the appellant, pursuant to Dr. Lovely’s instruction, the appellant became uncooperative and unruly, so that Dr. Lovely had to be called in to calm her. Willis testified that the appellant “smelled like she had been drinking.” Testimony was also presented by the State that indicated that the appellant had a “blood plasma” alcohol content of .25% approximately two hours af *299 ter the accident, and a “whole blood” alcohol content of .167% approximately four hours after the accident.
Applying the aforementioned legal authority to the facts presented herein, we find that the State presented sufficient evidence to sustain the appellant’s convictions.
AFFIRMED.
All Judges concur.