Appellant, Danny Ray Miles, AKA Danny Ray Mylar, was convicted of murder in the first degree and the jury fixed his punishment at life imprisonment in the penitentiary. Throughout the trial proceedings appellant was represented by the widely known law firm of Wilkinson, Purvis, Pickard Parsons of Birmingham. All of these lawyers are experienced in trial work and are noted for their resourcefulness, ingenuity and astuteness in protecting the constitutional rights of their clients.
This is one of the most bizarre cases to find its way to this Court in a long time. It involves a double murder, robbery, kidnapping and rape. The victims were Mrs. Clarice Knabe and Ronald Harvel White. Appellant was indicted for killing White with a .38 caliber pistol and one Samuel "Bud" Yarber was indicted and convicted in the shooting death of Mrs. Knabe and he, too, was sentenced to life imprisonment. This is a classical case of two murder suspects, each trying to put the blame on the other and thus exculpate himself from a murder conviction. Their efforts backfired and justice still reigns supreme.
This tragic episode began on the late afternoon of November 3, 1975, when appellant went to the apartment of Yarber around 6:30 p.m. About 45 minutes later they left in Yarber's car to go out drinking. They went to several bars and drank beer at each. Appellant asked Yarber to accompany him to K-Mart's Sporting Goods Department in order to purchase some ammunition for Yarber's .38 caliber pistol which appellant had previously asked to borrow. They went to K-Mart, where appellant purchased a box of ammunition around 9:00 p.m. that night. This purchase was recorded in a book which the manager of the Sporting Goods Department testified he was required by law to keep.
The two men then returned to Yarber's apartment where Yarber gave appellant his pistol. As appellant was loading the pistol the pistol discharged and the bullet lodged in the wall or ceiling of the living room. Yarber became provoked at appellant for discharging the pistol in his apartment for fear he would be evicted. Appellant apologized to Yarber and carried the pistol out of the apartment and put it in his car.
A short while later the two men left in appellant's car and went to the 2010 Lounge in downtown Birmingham, arriving there around 9:30 p.m. They parked in the rear parking lot and entered the lounge through the back door. There were a number of customers in the place at the time. They were all drinking and watching a football game on television. The football game was over just before 11:00 p.m. and everyone left except the bartender, Mrs. Clarice Knabe, Mr. Ronald Harvel White, *Page 803 
appellant and Mr. Yarber. At this time, according to the testimony of Mr. Yarber given at a preliminary hearing, appellant pulled out the pistol he had borrowed from Yarber and ordered Mrs. Knabe and Mr. White to put their hands up and said, "This is a stick-up." Appellant ordered Yarber to lock the front door and then demanded all the money from Mrs. Knabe and Mr. White. Mrs. Knabe protested that the owner of the lounge did not leave any money in the place. Appellant walked behind the bar to check for himself. Appellant ordered White to empty his pockets on the counter and White put his wallet on the bar. At this time there was a knock on the front door and appellant ordered Mrs. Knabe and Mr. White out the back door and into the back seat of his car. Appellant ordered Yarber to drive the car. Yarber asked appellant where they were going and appellant told him to drive to the place where they had zeroed Yarber's deer rifle a few weeks previously. Yarber began traveling south on I-65 toward Hoover, Alabama, and turned south on Highway 31. They traveled south on Highway 31 to Highway 150 going toward Bessemer. During the entire trip from the 2010 Lounge appellant kept asking Mrs. Knabe what she was going to tell the owner of the lounge and she said, "We're going to tell him that two colored men came in and robbed us." Appellant asked White what he was going to say and White told him he was going to say the same thing that Mrs. Knabe was going to say.
Appellant pointed the pistol at Mrs. Knabe and White in the back seat and told them to take off all their clothes. After they had completely disrobed appellant told Mrs. Knabe to get in the front seat between him and Yarber and she did. When they
arrived at the appointed place appellant ordered Mrs. Knabe out of the car and told White to keep his hands up inside the car. Appellant then proceeded to have sexual intercourse with Mrs. Knabe on the trunk of the car while Yarber and White remained inside the car. He then ordered White out of the car and told Mrs. Knabe to lie on her back on the ground. Appellant ordered White to get on top of Mrs. Knabe. While they were in that position, according to sworn testimony given by Yarber at the preliminary hearing, appellant shot and killed both Mrs. Knabe and Mr. White. Appellant then reloaded the pistol, and he emptied it again into the bodies of the two victims. Yarber saw appellant standing over the two victims with the pistol in his hand and said he did not know how many shots were fired but thought there were ten to fifteen. Appellant then got back in the car and told Yarber to return to Highway 31, and to find some deep water so that he could dispose of the gun.
As they drove along appellant directed Yarber to throw the clothes of the victims out of the car at different places and intervals along the highway. He then had Yarber drive to Lake Purdy off Highway 119 where appellant got out of the car and threw the pistol as far into the lake as he could throw it, and threw two unspent cartridges several feet out into the lake.
While in the car on the way back to town appellant pressed Yarber to take some of the money that he had obtained in the robbery of Mrs. Knabe and Mr. White. Yarber told appellant that he did not want the money but he got around fifty dollars anyway, and appellant coached Yarber as to their alibi on this fateful night.
Yarber was called as a State witness during appellant's murder trial but he refused to answer a single question posed to him by the trial court or the District Attorney. Yarber would not even state his name. The trial court ruled that it would serve no useful purpose to hold him in contempt of court and sentence him to jail. The trial court, over appellant's objection, admitted into evidence Yarber's testimony given at appellant's preliminary hearing at which time Yarber was subjected to an extensive, vigorous, withering, thorough and searching cross-examination by appellant's lawyers.
It is noteworthy that appellant testified at his own trial and his testimony as to all the details, places, and circumstances leading *Page 804 
up to and culminating in the robbery, kidnapping and killing of Mrs. Knabe and Mr. White, in the main, pigtracked the testimony of Yarber with one exception: Appellant claimed that Yarber was the leading actor in the entire drama and it was Yarber who did all the things that Yarber accused appellant of doing.
Appellant objected to the introduction of Yarber's testimony given at the preliminary hearing on the ground that the proper predicate had not been laid for his former testimony, viz., (1) that the witness was not absent from the State permanently, (2) that he was not dead, (3) that he could not be found after diligent effort, (4) that he was not under any disability, and (5) that he was not available by reason of a claim of privilege. These were the common-law rules governing the admissibility of a witness's testimony, given under oath, at a former trial, or preliminary hearing, when the witness was cross-examined or the opportunity was afforded for cross-examination.
These rigid common-law rules have been relaxed in many states in the interest of insuring a full measure of justice. These rules have been relaxed in this state for this reason and it is now settled law. Wyatt v. State, 35 Ala. App. 147, 46 So.2d 837;Bridges v. State, 26 Ala. App. 1, 152 So. 51.
In Bridges v. State, supra, this Court said:
 "The witness Gilpin, when called, refused to testify, claiming his constitutional right not to be forced to give evidence which would tend to incriminate him. He thereby placed himself where he was not available to the state to be used as a witness. Thereupon, over the objection and exception of defendant, the state was allowed to make preliminary proof that this witness had been examined and cross-examined as a witness for the state on the former trial of this same case in the circuit court of Jefferson county, and over objection and exception of defendant the state was then allowed to read to the jury the testimony of the witness Gilpin given on such former trial. This is not now an open question in this state, and while there are some decisions to the contrary, this court and the Supreme Court have spoken on the question and we see no reason to reopen the subject. The witness Gilpin having testified on a former trial of this case, with full opportunity for cross-examination and when called to testify on this trial he rendered himself incompetent as a witness without fault on the part of the state, the trial court properly allowed his testimony on the former trial to be read in evidence. Woodward v. State, 21 Ala. App. 417, 109 So. 119; McCoy v. State, 221 Ala. 466, 129 So. 21."
Oliver Clark was driving on Highway 150 around 7:00 a.m. on November 4, 1975 and discovered the nude bodies of the victims. He went to a telephone and called the office of the State Troopers. State Trooper Jim Wallace responded to the call. After viewing the bodies Trooper Wallace secured the scene and notified all State, County and City law enforcement agencies.
J.F. Helton, Deputy Coroner of Jefferson County, came to the murder scene and pronounced the victims dead.
Jay Glass, an Assistant Pathologist, with years of experience in performing autopsies to determine the cause of death, came to the murder scene and performed autopsies on both victims. He stated that the cause of death of both the male and female was due to multiple gunshot wounds. The bodies were removed to a local morgue where more definitive autopsies were performed. He took a vaginal smear and by a microscopic examination determined evidence of spermatazoid. Mr. Glass also found numerous penetrating and perforating gunshot wounds to the head and body of both victims and he was able to remove several projectiles or slugs from each body. He further testified there were seven entrance wounds in the body of the female and nine entrance wounds in the body of the male.
Some sixteen witnesses testified for the State and we see no reason to detail the testimony given by each of them. Mrs. *Page 805 
Alma Vest was the last person to see appellant, Yarber, Mrs. Knabe and Mr. White together at the 2010 Club on November 3, 1975, just before 11:00 p.m. She knew Mr. White as he was her immediate supervisor at the Post Office where both of them were employed. At the time she left the 2010 Club with her companion no one was at the club except Mrs. Knabe, Mr. White, appellant and Yarber.
After these brutal killings were discovered the law enforcement officials in Jefferson County began an extensive manhunt to track down and apprehend the killers. Evidence technicians found fingerprints on glasses and beer bottles and Mrs. Knabe's purse on the night that they were missing from the club. These latent fingerprints were turned over to an expert technician whose qualifications were admitted by counsel for appellant. According to her testimony she was able to identify the latent prints left on the various items in the club with the known fingerprints of appellant and she testified that they were identical.
Other evidence technicians removed a .38 caliber bullet from the wall of the 2010 Club and from the home of Yarber. They also found spent cartridges at the scene of the double murder. A .38 caliber pistol was recovered from Lake Purdy along with two unspent .38 cartridges. The autopsy surgeon recovered three slugs from the body of Mr. White. All of these cartridges and slugs together with the .38 pistol were turned over to an expert to test-fire the pistol and make a microscopic comparison of the slugs removed from the club, from Yarber's home, and from the body of Mr. White. He testified that the microscopic comparison showed beyond doubt that each of these slugs was fired from this particular .38 caliber pistol.
In short, the evidence adduced by the State weaved a web around appellant from which he was unable to extricate himself from his connection with this double murder.
As we have pointed out the testimony of appellant and the testimony of Yarber given at the preliminary hearing were conflicting in the extreme. It was solely within the province of the jury, and not this Court, to determine the credibility of these two felons. Snipes v. State, 50 Ala. App. 139,277 So.2d 413; Pugh v. State, 51 Ala. App. 164, 283 So.2d 616;Waters v. State, 55 Ala. App. 646, 318 So.2d 342. Hall v. State,50 Ala. App. 666, 282 So.2d 104.
In Stokley v. State, 254 Ala. 534, 49 So.2d 284, the Supreme Court held:
 "It is well established that when, by prearrangement or on the spur of the moment, two or more persons enter upon a common enterprise or adventure and a criminal offense is contemplated, then each is a conspirator, and if the purpose is carried out, each is guilty of the offense committed, whether he did any overt act or not. This rests on the principle that one who is present, encouraging, aiding, abetting, or assisting, or who is ready to aid, abet, or assist the other in the perpetration or commission of the offense, is a guilty participant, and in the eye of the law is equally guilty with the one who does the act. Such community of purpose or conspiracy need not be proved by positive testimony. It rarely is so proved. The jury is to determine whether it exists, and the extent of it, from the conduct of the parties and all the testimony in the case. Morris v. State, 146 Ala. 66, 41 So. 274, and cases cited; Jones v. State, 174 Ala. 53, 57 So. 31; Teague v. State, 245 Ala. 339, 16 So.2d 877.
 "When two or more persons enter upon an unlawful purpose, with a common intent to aid and encourage each other in anything within their common design, they are each responsible, civilly and criminally, for everything which may consequently and subsequently result from such unlawful purpose, whether specifically contemplated or not."
This was a cold-blooded murder without any mitigating or extenuating circumstances. Two helpless and defenseless victims were robbed, kidnapped and shot to death. It does not matter which of the two men actually pumped the bullets into the *Page 806 
bodies of Mrs. Knabe and Mr. White, they were both equally guilty of murder and must pay the penalty of the law.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none.
The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.