[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1259 
Murder, first degree; life.
The appellant was indicted by the Mobile County Grand Jury for the first degree murder of David Thomas. His request to be treated as a youthful offender was denied and, after arraignment, he was adjudged an indigent.
Counsel appointed for the appellant's defense at trial was also appointed as appellant counsel. Prior to trial, various motions were filed and ruled on, among them a motion to suppress any alleged inculpatory statements; a motion challenging the indictment; a motion to quash the petit jury venire, alleging that the exemption of certain persons from the jury venire was constitutionally impermissible; a motion to "voir dire" the jury; and a motion to produce. All of these motions were denied with the exception of the motion to produce, which was substantially granted on "all points." *Page 1260 
After a trial by jury, the appellant was found guilty and sentenced to life in accordance with the jury's verdict. The appellant filed a motion for new trial, which was also denied after a hearing.
The testimony presented by the State was, as follows:
Gary Jackson, the brother of the victim, David Thomas, testified that, prior to December, 1977, his brother was a school teacher and taught music in Marshall, Texas. According to Jackson, the last time he saw his brother alive was on December 23, 1977. He stated that, at that time, his brother was driving a "champagne brown" 1977 Thunderbird, with a Texas license plate.
During the trial, he identified State's Exhibits 1 and 2 as photographs of his brother's automobile and said that he had seen the automobile two days after Christmas at the intersection of St. Stephens and Stone Streets in Mobile, Alabama. Jackson said it was "about dusk dark" and he saw three black males in the car "wearing what they call skull caps."
During the trial, he identified the photographs of his brother's body and stated that he had seen his brother's body at the "U.S.A. Medical Center" in Mobile, Alabama.
David Anderson, fourteen years of age, testified that he and his younger brother, Darrell Anderson, and some friends were near the "WGOK" radio station in Mobile, Alabama, on January 1, 1978. According to Anderson, he and his brother and their friends were riding their bicycles in that area when they found a man's body. He said the body was lying near some bushes and that, when they went over to the body, they found that "some of the face was gone."
Anderson said they reported it to the station manager and that police were subsequently called. During the trial, he identified photographs of the man's body which he had seen at the radio station on that date.
During cross-examination, he testified that he did not see any cars or anyone in the vicinity of the body. Further, he said that he did not touch the body or pick up anything near the location of the body.
Mary Singleton Taylor lived at 808 Donald Street in Mobile, Alabama, on December 30, 1977. She testified that, on that day, she saw a grey car parked near the driveway at her home. According to Ms. Taylor, no one was in the car at the time and she recalled first seeing the car on the Tuesday night after Christmas. She said that the car remained there until her husband called the police on December 30, 1977.
During the trial, she identified State's Exhibits 1 and 2 as pictures of the car that she saw parked near her house.
During cross-examination, she said she did not see anyone near the car nor did she go near the car during that time. Further, she stated that she did not see the car again after it was towed away.
Ladresta Marie Jackson, the sister of the deceased, David Thomas, testified that the last time she saw her brother alive was on December 24, between 9:30 and 10:00 P.M. She said he was in "top physical condition" and that he was driving a 1977 Thunderbird.
During the trial, she identified State's Exhibits 1 and 2 as pictures of her deceased brother's automobile.
Officer James E. Mayo, Sr., of the Mobile Police Department, testified that he saw the automobile, depicted in State's Exhibits 1 and 2, parked near the Amvet's Club at 1204 Davis Avenue in Mobile, Alabama, on the morning of the last Wednesday in December of 1977. He said that no one was in the car at the time and that the car had a Texas license plate.
Further, he said that Sgt. Beadnell and an "ID officer arrived within forty minutes afterwards.
According to Mayo, he and the officers searched the area where the body was discovered and found an address book, blue in color, with some "flower designs" on it. He said that the address book contained addresses *Page 1261 
from the Pritchard, Mobile, and Texas areas. Further, he said that he was not positive, but he believed that the name of the deceased was written in the front of the address book.
Further, he said that, about twenty or twenty-five feet from where the body was located, they found "partial pieces of bone fragments, skull fragments, and pieces of hair." He said all these items were turned over to Sgt. Beadnell.
Mayo also recalled that, on January 1, 1978, he was at the Mobile Police Station with Sgt. Robinson, Sgt. Lockett, Sgt. Raymond Smith and Lt. William Milne. He said that, at that time, he saw the appellant, James Ceefers Williams, in the interrogation room at the police station. Further, he said that he also saw Earnest James, also known as "Dod Yank," and said that he had known him for about two and a half years.
Mayo recalled that, at the time he saw the appellant on that date, appellant was wearing a "tee" shirt, bluejeans and a pair of "earth-type hush puppies" shoes with the laces untied. According to Mayo, the shoes the appellant was wearing appeared to be covered with numerous drops of dried blood.
Mayo said that, when he observed Earnest James ("Dod Yank") on that day, Earnest James had an upper tooth missing and a bad bruise on his cheek "that had had time to yellow." Further, he said that James' right hand was swollen in the knuckles and that the palms of both hands "were cut up by some type of object."
According to Mayo, he had seen James or, "Dod Yank," a week earlier and he did not have a missing tooth or the bruises.
Also, Mayo said he knew the appellant and had known James for about two and one-half years.
During cross-examination, Mayo acknowledged that he did not know how James had sustained the injuries and said that, at the time he saw the appellant on that day, the appellant did not appear to have any injuries.
Glenn Wyley testified on behalf of the State and acknowledged that he had been convicted of grand larceny, auto burglary, and robbery. He testified that he had known the appellant, James Ceefers Williams, for about four years and Earnest James for about two years.
Wyley recalled that, about 4:00 A.M., December 25, 1977, he saw the appellant and James at the Amvets Club in Mobile, Alabama. He said that they were alone at that time and both were drunk. Further, he said that, when they came in the door, they had "blood and stuff on their clothing."
According to Wyley, when he and the two men subsequently left the club, the appellant told him that "he had killed somebody and he showed me the keys and showed me the car and he asked me did I want a ride and I told him no." Wyley said at that point the two men drove away in a new Thunderbird with Texas license plates.
During the trial, Wyley identified State's Exhibits 1 and 2 as photographs of the car he saw on that occasion. He stated that, two days after Christmas, he again saw the car going up Davis Avenue in Mobile, driven by the appellant with James and some other people in the car. He said that, after he saw the car on that occasion, he never saw it again.
During cross-examination, Wyley testified that he had been drinking beer and wine for about six hours on the day he saw the appellant at the Amvets Club and that he had "drunk enough to make me all right." Further, he said he was "picked up" by Officers Mayo and Duff and that he had talked with Sgt. Lockett at headquarters at the police building. He said that he had talked with Sgt. Lockett both before the trial and on the day of the trial.
On further questioning, Wyley testified that the blood he saw on the clothing of the appellant and James was "still kind of wet like."
Edwin L. Scott was a licensed physician and pathologist at the Mobile Infirmary, and the assistant county coroner. He testified that he performed an autopsy on the *Page 1262 
body of the deceased, David Thomas, on January 3, 1978, and said that the autopsy was performed on three different days, as a "continuation." Dr. Scott testified that there were multiple lacerations and abrasions upon the body, but primarily to the head. He stated that, "[t]here was a severe defect on the entire left side of the skull so that the left ear was completely missing. Extensive skull fracture at this point. Three other lacerations on top of the head with skull fractures beneath these lacerations. There was extensive brain damage beneath the skull fractures. There were several lacerations and bruises on the arms and on the neck."
It was Dr. Scott's opinion that the wounds on the head were caused by "[s]ome type of heavy blunt instrument which probably had a sharp edge at one end or the other because there were small punctate marks in addition to these lacerations."
In his opinion, the cause of death was "[t]he multiple blows to the head with subsequent skull fractures and brain damage." Further, he said, from his examination of the body, it was his estimate that the person had been dead about "three to five days."
Erin Jordan, Jr., was eighteen years of age and, at the time of the trial, was in the county jail. He testified that he did not know the appellant as James Ceefers Williams, but had heard of someone named "Buster." He also said that he had heard of "Dod Yank" and that they had practically grown up together."
During the trial, he was shown State's Exhibits 1 and 2, and stated that he had seen a car that "looked like that," on Davis Avenue and Marshall Alley. According to Jordan, he acknowledged seeing the car sometime between Christmas of 1977 and New Year's, 1978, but could not remember the specific date.
Jordan said that, at the time he saw the car, "Buster," whom he identified as the appellant in the courtroom, was standing on the outside of the car.
According to Jordan, the next time he saw "Buster" (the appellant) was on a Saturday sometime afterward, and at that time, the appellant asked him to go to "Uptown Motors" with him to get his car. Jordan said the appellant then showed him some keys which appeared to be "house keys" and that he told the appellant he would not go.
During cross-examination, Jordan admitted seeing "plenty of cars like that" shown in State's Exhibit 2. Further, he said he was in court because they "come and got me man." Also, he said he had talked to Sgt. Lockett about the case on the day of the trial and on one previous occasion.
Sgt. Paul Beadnell was with the Identification Division of the Mobile Police Department. He testified that, on December 30, 1977, he had gone to the area near the "WGOK radio station." When he arrived, he saw a black male lying in the bushes and, during the trial, he identified photographs which he had taken on that occasion. He identified pictures taken of the scene and the evidence gathered, which included a part of an auto jack, a necklace, a notebook, and some other papers.
Beadnell testified that he "picked up a credit card" for a life insurance company bearing the name of the deceased. Further, he stated that all the items that he retrieved were submitted to Mrs. Pillman on January 5, 1978.
During cross-examination, Beadnell stated that they had attempted to lift fingerprints from "some wine bottles," and the car jack and the deceased's car, but were unable to make any readable prints from the jack and bottles due to the rainy weather. The prints taken from the deceased's car which were "readable" were not identified.
Alilee Pillman worked at the Mobile City Laboratory and testified that she had received a portion of a jack and a necklace from Sgt. Beadnell, which she identified during the trial. She said that she had examined the portion of the car jack "microscopically and serologically" and found that it "contained pieces of flesh and human blood and short Negro hair." *Page 1263 
During the trial, she also identified State's Exhibit 19 as a "pair of suede shoes" that had been submitted to her by Officer Myers on January 2, 1978. She testified that she had examined the shoes microscopically and serologically and found that they "contained human blood." However, she explained that she could not tell the type of blood "due to the suede material."
Officer Ray Steven Robertson, of the Mobile Police Department, testified that, on December 30, 1977, he and Officer Kirksey examined an automobile which was located at Donald and Lucky Streets, located in Mobile, Alabama.
During the trial, he identified State's Exhibits 1 and 2 as photographs of the car that he had seen at Donald and Lucky Streets. He said the car was a Thunderbird with Texas license plates.
According to Robertson, the officers found sheets of music and a brown, plaid, winter coat in the trunk of the car. Inside the car they found a blue sweater, an empty beer can and an eight-track tape cartridge. He said he also found two teacher's certificates bearing the name of the deceased, David Jerome Thomas, and a Delta Airline passenger ticket in the glove compartment.
Robertson said he did not find any type of weapon, nor did he see any traces of human blood in the car. He stated that, after the examination, the car was towed away by the police wrecker.
Detective Sgt. Raymond Smith of the Mobile Police Department testified, at a voir dire hearing outside the presence of the jury, that the appellant had executed a "waiver of rights and counsel form" on December 31, 1977, at approximately 10:40 P.M. He said that Lt. Walter Milne and Sgt. O.C. Lockett were present at the time the form was signed and that they witnessed the signing. Further, he said that the appellant was not suffering from any physical or mental disease nor was he under the influence of alcoholic beverages or drugs at the time he signed the form. Smith said that the appellant executed the form voluntarily and without coercion.
Smith also testified that, on the following day, the appellant asked him to come to his cell because he [the appellant] wanted to talk to him. Smith stated that the appellant was brought to his office and that he [Smith] reminded him of his Miranda rights of which he had previously informed appellant. He asked if appellant understood the rights and if he needed any explanation. Smith said that, at that time, the appellant made an oral statement. At the conclusion of the voir dire hearing, the jury was returned to the courtroom and Smith gave substantially the same testimony he had given at the voir dire hearing. Smith said that the appellant made the following oral statement to him:
 "I was there when the man was killed but I was not the only one there."
During the trial, State's Exhibit 21, which was the "Waiver of Rights and Counsel Form," was introduced into evidence without objection.
Lorenzo York testified that the deceased, David Thomas, was a close friend and that they grew up together. York stated that he saw the deceased on two occasions during the Christmas season of 1977, the last time on Christmas Eve. York said that the deceased left his house between 10:30 and 11:00 P.M. and was alone when he drove away. York recalled that the appellant was driving a "brand new Thunderbird" and identified State's Exhibits 1 and 2 as pictures of the deceased's car.
Marion Dent was the next witness called by the State and, prior to any testimony by this witness, a hearing outside the presence of the jury was conducted. At that time, Dent informed the trial judge that he knew nothing about the case and, after instructions by the trial judge, he acknowledged that he intended to claim his Fifth Amendment privilege against self-incrimination. At the end of these proceedings, the jury returned to the courtroom and Dent's testimony was substantially the same as that he had given previously. Dent informed the court ". . . Judge, I don't know nothing, the only thing I know, they picked me *Page 1264 
up one night. I don't know nothing about no murder . . . I don't know what testify means . . . what I'm saying Judge, I don't know nothing."
After this statement to the court by Dent, the trial judge declared that Dent was unavailable, "by reason of having invoked his constitutional immunity."
After Dent was dismissed, the State called Bryan Delmas, an identification officer with the Mobile Police Department. Delmas identified State's Exhibit No. 20, an envelope containing certain evidence, as one which he had received from Sgt. Lockett on January 26, 1978. He stated that he had transported the envelope to the police laboratory, where it was turned over to Mrs. Pillman.
Ronnie Myers, an evidence technician with the Mobile Police Department, testified that he had received State's Exhibit No. 19 from Sgt. Lockett on January 1, 1978. He said that he had turned the exhibit, which he identified during the trial, over to Alilee Pillman at the Mobile Crime Laboratory.
During cross-examination, Myers acknowledged that the exhibit, appellant's shoes, was in a plastic bag when he received it and stated that the shoes had "what appeared to be spots of blood on the top of [them]." He also acknowledged that he did not mark the shoes in any way nor did he mark the bag in which they were kept.
Detective O.C. Lockett of the Mobile Police Department was the principal officer involved in the investigation of the murder of David Jerome Thomas. According to Lockett, he had gone to the area at which the body had been found and was present when certain photographs were taken of the area and of the body. He identified these photographs during the trial and stated that nothing was found in the pockets of the deceased's clothing when a search was made.
Lockett testified that, on January 1, 1978, he saw James Ceefers Williams, the appellant, at the detective bureau in the Mobile Police Station. He said that the appellant's appearance at that time was the same as he appeared in court, with the exception that appellant had had a "much fuller head of hair" at the time of his arrest. He also recalled that the appellant was wearing a pair of "suede type, three-quarter top [shoes] with crepe soles on them." During the trial, he identified State's Exhibit No. 19 as the appellant's shoes by stating that "[t]hey appear to be the same shoes, yes sir."
Lockett said the shoes were seized at the time of appellant's arrest and were turned over to Ronnie Myers, who transported them to the laboratory for analysis. Further, Lockett acknowledged that the shoes appeared to be in the same condition they were in at the time they were turned over to Officer Myers.
Lockett also testified that, on January 26, 1978, he went to the Amvets Club at 1204 Davis Avenue where he retrieved a set of keys from the roof of the club. The key ring had "a large letter `D' on the end of it."
During cross-examination, Lockett agreed that neither he nor any one in his presence placed any type of identifying marks on the appellant's shoes when they were taken from the appellant and turned over to Myers. He acknowledged further that the shoes "appeared to be" the same shoes he had taken from the appellant.
Michael Edward McMaken, an assistant district attorney in Mobile County, stated that he was the prosecuting attorney at the preliminary hearing involving the appellant, James Ceefers Williams, and Earnest James. According to McMaken, the two men were charged with first degree murder and robbery, and the preliminary hearing was conducted before District Judge Dominick Matranga. McMaken stated that there was no official court reporter present at the hearing and that the appellant was represented by counsel at that proceeding.
McMaken said that he did not remember the testimony of the various witnesses at the preliminary hearing "word for word" but stated "basically, I remember what transpired." McMaken stated that the testimony *Page 1265 
of each witness at the preliminary hearing was subject to both direct and cross-examination conducted by two defense attorneys and the prosecuting attorney.
McMaken did not recall the name of the deceased but did remember, in his account of the substance of Marion Dent's testimony, that the appellant had asked Dent whether Earnest James had told him where the appellant and James got the car, and how the car was taken. According to McMaken, Dent had indicated to the appellant that James had made those facts known to him and the appellant had responded, "Well, if you don't believe it, I will take you out and show you where it happened."
McMaken said he did not recall any further testimony by Dent regarding this conversation. McMaken said that Dent had also testified that Earnest James had come to his (Dent's) home on Christmas day and had driven him to a party in the deceased's car. Dent had also said he had ridden in the car on a second occasion when the appellant had been driving.
McMaken stated that Dent had testified that he had seen the car on other occasions in the neighborhood. Dent had said that sometimes it was being driven by the appellant and on other occasions, by some other person.
During cross-examination, McMaken said that Dent had testified at the preliminary hearing that he had been convicted of burglary and that he was currently in jail, charged with grand larceny. McMaken further stated that Dent had testified that Sgt. Lockett had talked to him about the case while he was in jail, a few days after the incident.
McMaken denied that his testimony was based on what he had seen on the offense report for this case. McMaken told the court: "I believe I remember the things I thought were significant for the purpose of making out a prima facie case at the preliminary hearing, plus a few little details that for one reason or another just stick in my mind."
After McMaken's testimony, the defense made a motion for a mistrial, which was denied by the trial court.
Gary Jackson, the deceased's brother, was recalled by the State and, after he identified State's Exhibit No. 20 as the keys to his brother's car, the State rested its case. At this point, defense counsel made a motion to exclude the State's evidence on the grounds that the State had not proved a prima facie case, which motion was denied by the court.
The appellant did not take the stand in his own behalf but presented the testimony of the following witnesses:
James Lee James testified that he had known Marion Dent for "about seven or eight years." He acknowledged that, during that period of time, he had seen Dent "inject heroin into his arm."
During cross-examination, James admitted that he had refused to talk to the prosecuting attorney prior to the trial but had said that he would talk to him from the witness stand.
Raymond A. Pierson, the prosecuting attorney for the State, was then called by the defense. He acknowledged that the defense attorney had told him that he was "welcome to" talk to James Lee James, prior to his testimony at trial.
Dorethea Williams, sister of the appellant, testified that she was present when Marion Dent was brought to the courtroom by police officers. She stated that she overheard one of the officers tell Marion Dent "if he didn't tell the story right he would throw a case on him [Dent] where he would never get out of prison again."
Upon the completion of Ms. Williams' testimony, the defense rested, and the case was then submitted to the jury.
 I
It is contended that the jury venire, from which the petit jury which tried the appellant was chosen, was made up in an unconstitutional manner. Counsel for appellant argues that §12-16-2, Code of Alabama *Page 1266 
1975, unconstitutionally excludes certain classes of people from jury duty based upon their occupation or profession. Appellant claims that this is in violation of the Sixth Amendment of the United States Constitution because it deprived him of a fair opportunity of obtaining a representative cross-section of the community on the jury which tried him.
Further, it is claimed that § 12-16-2, Code of Alabama 1975, was changed by Acts of Alabama, No. 594. Which was passed by the legislature and approved by the governor on April 27, 1978. Counsel maintains that the prime reason for the passage of this new statute was the "constitutional uncertainty" of § 12-16-2.
On April 18, 1978, immediately prior to the selection of the jury, the appellant filed a motion to quash the petit jury venire. That motion, alleges the following grounds:
 "1) That the petit jury venire is made up in such a manner as to be violative of the U.S. Constitution;
 "2) That certain people are exempt from duty by virtue of their belonging to a particular class of people;
 "3) That the U.S. Constitution prohibits discrimination based on belonging to a particular class of people;
 "4) That the manner in which the jury venire is selected denies this Defendant of a jury made up of a cross-section of society thus not being a jury of his peers."
Objections to the venire of jurors can be taken only for fraud in the drawing or summoning of jurors. § 12-16-80, Code of Alabama, 1975; Maund v. State, 254 Ala. 452, 48 So.2d 553.
In Shields v. State, 52 Ala. App. 690, 296 So.2d 786, this court said:
 "The fraud required to quash the venire is the intentional omission from the jury roll of names of a large number of legally qualified citizens, and such intentionally systematic exclusion must be shown."
See also Smith v. State, 54 Ala. App. 561, 310 So.2d 484.
The initial burden of showing the State's purposeful or deliberate exclusion of any identifiable group from participation as jurors rests with the appellant. Giddens v.State, Ala.Cr.App., 333 So.2d 615. In the absence of a showing of purposeful systematic exclusion, no reversal is required.Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759;Butler v. State, 285 Ala. 387, 232 So.2d 631.
In the present case, the appellant has made no showing of fraud or a purposeful or deliberate exclusion of any identifiable group. Swain v. Alabama, supra. Nowhere in the appellant's motion does he indicate that the drawing or the summoning of the jurors was done in a fraudulent manner. He cites no authority for his allegations and no evidence was submitted to support his motion.
Without such a showing of purposeful systematic exclusion this court is without authority to reverse.
 II
Counsel for appellant asserts that the shoes, admitted into evidence as State's Exhibit 19, were not shown by positive proof to be the same shoes taken from the appellant. He argues that the officers who had taken the shoes from the appellant were unable to positively identify the shoes, but were able to say only that they "appeared to be the same shoes." He insists that without "the strictest proof of chain of custody" there is no certainty that the shoes introduced into evidence as State's Exhibit 19 were the same shoes taken from the appellant. Without such proof, appellant maintains it was error for the court to admit the shoes into evidence.
This court, in Bell v. State, Ala.Cr.App., 339 So.2d 96, articulated the purpose in establishing "chain of custody," i.e., to show a reasonable probability that there has been no tampering with the item of evidence to be introduced.
In Sexton v. State, Ala.Cr.App., 346 So.2d 1177, this court stated: *Page 1267 
 "To warrant the reception of an object in evidence against an objection that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty, but only to a reasonable probability that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain."
See also, Waters v. State, Ala.Cr.App., 360 So.2d 358.
Where a weak link in the chain of custody is said to exist, it presents a question of the credit and weight to be accorded rather than of the evidence of the admissibility of the item.King v. State, 45 Ala. App. 348, 230 So.2d 538; McClary v.State, 51 Ala. App. 30, 282 So.2d 379, reversed on other grounds, 291 Ala. 481, 282 So.2d 384.
It is well established that articles or objects which would tend to elucidate or explain a material inquiry are admissible into evidence when properly identified. Robinson v. State,49 Ala. App. 511, 273 So.2d 487. Articles of clothing worn by the defendant at the time of his arrest are so admissible. Moffettv. State, 291 Ala. 382, 281 So.2d 630.
Finally, the clothing of the accused is admissible in homicide trials where such objects tend to corroborate, disprove, illustrate or elucidate any other evidence. Even though such evidence may have a tendency to bias or prejudice the jury. Barbour v. State, 262 Ala. 297, 78 So.2d 328; Teaguev. State, 245 Ala. 339, 16 So.2d 877.
Although no identifying marks were placed on the shoes by any of the officers having custody, the shoes were adequately identified by each officer as those he or she had received.
A witness may testify to his beliefs, thoughts or impressions where he had the opportunity to observe. See McElroy, Alabama Evidence, § 115.01 (2) (3rd ed., 1977). In Gady v. State,83 Ala. 51, 3 So. 429, a witness was allowed to testify that a ten-dollar bill which he was shown in court "looked like" the ten-dollar bill which had been stolen from him. A witness was also allowed to testify that some wheat which he had seen at one location was the same wheat which he had seen elsewhere.
In the present case, the shoes taken from the appellant at police headquarters by Officer Lockett were turned over to Officer Myers on January 1st. Myers testified that he turned the shoes over to Alilee Pillman at the city laboratory on January 2nd. In his testimony, Myers acknowledged that, from the time he received the shoes from Sgt. Lockett until they were turned over to Ms. Pillman, neither he nor any one in his presence had altered them in any manner. Ms. Pillman stated in her testimony that she had received the shoes from Myers about 1:45 P.M. on January 2, 1978.
Additionally, the shoes taken from the appellant were shown to have been those he wore at the time of the homicide and were shown to contain human blood. They were therefore properly admitted into evidence. Phillips v. State, 248 Ala. 510,28 So.2d 542.
Therefore, it is our judgment that the admission of the appellant's shoes was not error. The evidence showed there was more than a reasonable probability that the shoes were one and the same and were in the same condition as when taken from appellant. Any irregularity in the chain of custody would merely pose a question of "credit and weight" of the evidence for the jury.
 III
The appellant complains that it was error to admit the testimony concerning the physical appearance of Earnest James on January 1, 1978. He argues that this evidence was irrelevant and severely prejudicial to his case. On January 1, 1978, Earnest James was also in custody for the murder which is the subject of this appeal.
The evidence in question was given during the testimony of Officer Mayo. Mayo was allowed, over defense's objection, to describe James' appearance on the date the officer observed him in custody. Mayo described James as follows: *Page 1268 
 "He had a tooth missing that he had had about a week before that I had seen, he had bad bruise on this cheek that had time to yellow. You could visibly see it. His right hand was swollen in the knuckles. The palms of both of his hands were cut up by some type of object in both palms of his hands."
Prior to this testimony, the prosecutor explained to the court, out of the presence of the jury, that the State's theory of the case alleged that the murder was the result of a conspiracy between the appellant and James. Further, the State insisted that this testimony was relevant to show that James had been involved in some type of struggle and to show "the contact between Earnest James and someone else."
It is well established that a conspiracy entered into for unlawful purpose need not be proved by positive evidence, and may be determined from the conduct of the parties, relevant testimony, circumstances surrounding the act and from conduct of the accused subsequent to such act. Lash v. State,31 Ala. App. 121, 14 So.2d 235; Tait v. State, 37 Ala. App. 130,65 So.2d 208. Any physical evidence discovered after the act tending to connect certain persons with the conspiracy is also admissible to show their connection. Lancaster v. State,21 Ala. App. 140, 106 So. 609; Dawkins v. State, 20 Ala. App. 54,100 So. 619.
In the present case, the fact of Earnest James' appearance on January 1, 1978, the day he and the appellant were arrested for Thomas' murder, was relevant to the issue of appellant's guilt. Thomas' murder was a brutal and violent act, which is shown by the condition of the body. According to the coroner's testimony, the cuts and wounds on the deceased's arms indicated that he had attempted to defend himself against the blows of an attacker.
The appellant and James were seen in the deceased's car on the night the deceased disappeared. They were also described as wearing clothing covered with blood and bragging that they had just killed someone. This evidence of the conduct of the appellant and James was sufficient to show their joint connection with the murder.
In our judgment, testimony regarding James' physical appearance at the time of his arrest was relevant to the issue of appellant's involvement in the murder. See Dutton v. Evans,400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213, and Green v. State,42 Ala. App. 439, 167 So.2d 694.
The appellant also maintains that the testimony concerning James' appearance was inadmissible because of the remoteness of Officer Mayo's observation. In support of this contention, appellant cites Smitherman v. State, 33 Ala. App. 316,33 So.2d 396. In Smitherman, we find the testimony in question was held to be too remote because twenty months had intervened between the time the defendant applied for a permit to purchase explosives and the time of offense of killing fish by explosives or dynamite.
In the present case, James' appearance at the time of his arrest, on January 1, 1978, in connection with a murder committed on December 25th or 26th, 1977, does not meet the definition of remoteness illustrated in Smitherman, supra. The time lapse in the present case was not significant and the evidence should not have been excluded for remoteness.
Finally, the inference that James had been in a struggle is certainly not an "inference drawn from unreliable, speculative or conjectural circumstantial evidence." Wear v. Chenault MotorCo., Inc., 52 Ala. App. 382, 293 So.2d 298. Here, the testimony stated that James' knuckles were swollen and his upper tooth was missing. Expert testimony established that the wounds on the deceased's body showed that he had defended himself. Therefore, it seems clear that there was no inference drawn from another fact which is itself an inference.
In view of the foregoing, the testimony concerning James' physical appearance was material and relevant to the issue of the appellant's guilt and was properly admitted into evidence. *Page 1269 
 IV
The appellant asserts that the testimony offered by the prosecution as secondary evidence of Marion Dent's testimony during the preliminary hearing failed to meet the standards required by the law in Alabama. He argues that the law requires the person testifying for the unavailable witness to testify to the substance of all the testimony, relevant or irrelevant, and whether or not important to him as the witness.
In support of this contention the appellant has cited Mageev. Doe, 22 Ala. 699; Central of Georgia Ry. v. Carlton,163 Ala. 62, 51 So. 27; Gildersleeve v. Caraway, 10 Ala. 260.
Magee v. Doe, supra, was a civil suit for ejectment from land. There, the testimony was offered in lieu of that of a deceased witness, which was rejected by the trial court. In that case, the court enunciated the rule that, where evidence of a deceased witness is offered, the substance of his whole testimony must be proved.
The court noted that such parts of the testimony as are irrelevant and have no bearing on the case may doubtless be rejected by the court. However, the party against whom the evidence is offered is entitled to the substance of the whole testimony, and it is not for the party offering the testimony to determine the relevancy of the portions which he omits to prove.
Central of Georgia Ry. v. Carlton, supra, another civil suit, was an action for a wrongful death in which it was held to be error for the trial court to allow testimony by one witness of another's testimony at a former trial. In that case, the Supreme Court of Alabama said:
 "[I]n order to testify as to what a witness swore to on a former trial, it is necessary only that the witness can state the substance, and not the exact words that were spoken, yet it is necessary that he remember the substance of all the testimony. The witness in this case showed, on cross-examination, that he did not remember even the substance of certain parts of the testimony."
Again, in Gildersleeve v. Caraway, supra, a civil suit involving a promissory note, the court stated:
 "Proof of what a deceased witness swore to on a former trial, is admissible, and the party offering it cannot be required to prove the precise language used by the deceased witness. But the witness must be able to state the entire substance of what the deceased witness swore to, both on the examination in chief, and on the cross-examination, if there was one, and if he is not able to do this, the testimony must be rejected."
Testimony of a witness at a former trial is admissible in a second trial when, at the time the witness is deceased, under a disability, is permanently absent from the State or is unavailable by reason of his claim of privilege at the second trial. Wyatt v. State, 35 Ala. App. 147, 46 So.2d 837.
In Anderson v. State, Ala.Cr.App., 362 So.2d 1296, this court stated the general rule regarding the use of former testimony, as follows:
 "Testimony of a witness, in a former trial or action, given (1) under oath, (2) before a tribunal or officer having by law the authority to take testimony and legally requiring an opportunity for cross-examination, (3) under circumstances affording the party against whom the witness was offered an opportunity to test his credibility by cross-examination and (4) given in a litigation in which the issues and parties were substantially the same as in the present cause, is receivable as evidence in the present trial (5) when the personal attendance of the witness to testify in the present trial is not feasible."
The court went on to say that, in laying a predicate for the introduction of such testimony, the proponent of the testimony must show that he has exercised due diligence in seeking to procure the attendance of the witness.
Whether the predicate established was sufficient to authorize the introduction of the proof of such testimony of the absent *Page 1270 
witness is a question addressed to the trial court. Hardaman v.State, 17 Ala. App. 49, 81 So. 449.
Under these circumstances, we find no error in the court's rulings which allowed the testimony of the assistant district attorney, who prosecuted the preliminary hearing, as secondary evidence of the unavailable witness's testimony. In the present case, the trial court declared the witness, Marion Dent, unavailable to testify because he had invoked his privilege against self-incrimination and had refused to respond to any questions regarding the incident.
No contention is made regarding the court's determination as far as the unavailability of Marion Dent, but objection is made to the court's ruling allowing secondary evidence of Dent's prior testimony.
However, there is substantial authority to support the trial court's determination of unavailability of Dent as a witness on these grounds, and its ruling to allow secondary evidence of his testimony. See Woodward v. State, 21 Ala. App. 417,109 So. 119, in which a co-defendant refused to testify for the State at a second trial, and Miles v. State, Ala.Cr.App.,343 So.2d 801, where a co-felon refused to testify.
The testimony of a witness at a prior trial may be given orally by another who was present at the former trial or action when it is shown that the witness was unavailable. Howard v.State, 49 Ala. App. 548, 274 So.2d 104; Fuqua v. State,2 Ala. App. 47, 56 So. 751; Marler v. State, 67 Ala. 55.
No requirement exists that the exact words be given, where secondary evidence is offered, if such a witness is able to give the substance of all that was sworn to by the unavailable witness. Harris v. State, 73 Ala. 495; Davis v. State, 17 Ala. 354.
The fact that the assistant district attorney was unable to remember the names of other persons present at the time of appellant's statement to Dent, or the exact location at which the statement was made, or the order in which the defense attorneys cross-examined him, does not reflect an inability to recall the substance of Dent's testimony. Also, the failure of the district attorney to remember other details of the testimony would not render it inadmissible as not constituting the substance of Dent's testimony.
During cross-examination, the assistant district attorney testified, as follows:
 "I believe I remember the things that I thought were significant for the purpose of making out a prima facie case at the preliminary hearing, plus a few little details that for one reason or another just stick in my mind."
The issue here was whether the assistant district attorney had sufficient recollection of the substance of Dent's testimony. The assistant district attorney had previously testified that he had an adequate opportunity to observe Dent and testified that he remembered the substance of the testimony. The law does not require absolute knowledge or perfect recollection in a witness. The witness's knowledge is sufficient if he had an opportunity of personal observation and obtained some impression, even if his recollection is faint.Mitchell v. State, 94 Ala. 68, 10 So. 518.
Also, where it is shown that a witness had an opportunity to observe the facts about which he testifies, and that his testimony signifies only imperfect recollection, there is not valid reason for not admitting the testimony. See McElroy, Alabama Evidence, § 115.01 (3rd ed. 1977). In the present case, the assistant district attorney's inability to remember names and places would pose a question for the jury as to the weight it would accord his testimony. Littlefield v. State,36 Ala. App. 507, 63 So.2d 565.
In Littlefield, supra, this court wrote:
 "That a witness phrases his testimony in such terms as `I think,' `I believe,' etc., does not render such testimony inadmissible." *Page 1271 
Appellant's assertion that prejudice occurred because of the substitution of the testimony of an assistant district attorney for that of a less credible person was answered in Thompson v.State, 106 Ala. 67, 17 So. 512, and Wyatt v. State, supra. In those cases, it was held that the testimony of a "committing magistrate," or that of a judge, regarding testimony given before him is admissible in a later proceeding. In view of the foregoing reasoning, it is our judgment that the admission of the testimony in question was not error.
We have searched the record and have found no error prejudicial to this appellant. Therefore, the judgment of conviction by the Mobile Circuit Court should be affirmed.
AFFIRMED.
All the Judges concur.