I concur in that portion of the opinion that affirms a portion of the judgment of the trial court, but I must respectfully disagree with that portion of the opinion that holds that, under a totality of the circumstances, defendant Alabama Power Company failed to lay a proper predicate for the admission of the results of the toxicological tests performed on the urine samples taken from Curtis Green's body.
I have read the testimony of Dr. Perades and that of Ms. Shevlin regarding the taking of the urine sample, and I am completely convinced that the trial court did not err in admitting the evidence in this case. Counsel for the plaintiff himself established that the urine sample was taken from Curtis Green. In fact, by cross-examination, counsel for the plaintiff had Dr. Perades identify a picture of Green and testify that his death was caused by electrocution.
The majority, in holding that there was a "missing link" here, quotes from Ex parte Williams, 548 So.2d 518, 520 (Ala. 1989), as follows:
 " 'The purpose for requiring that the chain of custody be shown is to establish *Page 1333 
to a reasonable probability that there has been no tampering with the evidence. Williams v. State, 375 So.2d 1257 (Ala.Cr.App.), cert. denied, 375 So.2d 1271 (Ala. 1979); Tate v. State, 435 So.2d 190
(Ala.Cr.App. 1983); Smith v. State, 446 So.2d 68
(Ala.Cr.App. 1984). "The evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain." Slaughter v. State, 411 So.2d 819, 822 (Ala.Cr.App. 1981) (emphasis supplied [in Ex parte Williams, 548 So.2d at 520]).' "
The majority claims that it follows and applies the "reasonable probability" rule of Ex parte Williams,548 So.2d 518, 520 (Ala. 1989), but its listing of its reasons shows that it applies a "leads to conjecture" test, not a "reasonable probability" test:
 (1) "[I]f Dr. Perades drew the samples on June 4, the day of the accident, a significant and unexplained period of time intervened before the shipment arrived in Auburn on June 8, 1988"; and
 (2) "That fact, coupled with the patent discrepancy in the testimony regarding the content and substance of the samples, leads to conjecture
as to whether the samples received in Auburn were, indeed, those taken in Dothan from the body of the decedent, Curtis Green."
(Emphasis added.) What is especially troubling about the listing of these reasons for the insufficiency of the predicate is the fact that neither of them is mentioned in the objection made by the plaintiff's counsel at the time the toxicology report was admitted.[2] The fact that Dr. Perades did not testify that he drew a sample of blood is *Page 1334 
clearly not a "patent discrepancy," under the facts of this case. Clearly, it was not "patent" enough for counsel to mention it at the time he detailed to the trial court the reasons why he thought there was a break in the chain of custody and was not "patent" enough for counsel to mention it in his initial brief on appeal,[3] and it was mentioned only in a one-sentence reference in his reply brief.
What is most troubling, of course, is that the majority correctly states the rule in the Williams case,[4] but then does not properly apply it. Instead, it applies a "leads to conjecture" test, a test found in a 1955 Virginia case, Rodgersv. Commonwealth, 197 Va. 527, 90 S.E.2d 257 (1955) ("If 'the substance analyzed has passed through several hands theevidence must not leave it to conjecture as to who had it andwhat was done with it between the taking and the analysis' ").[5]
The Williams case, cited by the majority, but not followed, says that "[t]he evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain." Quoting Slaughter v. State, 411 So.2d 819 (Ala.Cr.App. 1981).
The Williams rule speaks of reasonable probabilities, notpossibilities, and clearly *Page 1335 
does not contain a "leads to conjecture" test, which the majority applies in this case.
The record in this case shows that there could be no "reasonable probability" that the urine sample that is the subject matter in this case came from the body of someone other than Curtis Green.[6] This record also shows that there could be no "reasonable probability" that the urine sample was tampered with.
In view of the facts in this record showing that Dr. Perades drew the urine sample during an autopsy on the body of Curtis Green, that he sent the samples in a sealed container to the laboratory, that the samples were received at the laboratory, and that they were identified on the paperwork included in the package as being samples from the body of Curtis Green, where is the "missing link"? In order to prove that there is no "missing link" in a case such as this, is it necessary to elicit testimony from each individual with U.P.S. who handles the package? Must the package reach its destination in less than four days? Can a trial court's ruling be reversed on a ground not urged during the trial of the case and not in the original brief, but only in the reply brief?[7]
This judgment should not be reversed. The evidence here just does not show that there was a "reasonable probability" that the urine sample was not placed in the sealed container[8] or that it was tampered with. The fact that there was a four-day interval between the drawing of the urine sample and its arrival at the State forensic lab does not create a reasonable probability that the urine sample was not the same as, and was different from, the object as it existed at the beginning of the chain. The fact that Dr. Perades failed to mention that he also included a sample of Green's blood in the sealed package does not show that there was a "reasonable probability" that the urine sample was tampered with.
In applying the "leads to conjecture" test, the majority necessarily has applied a "remote possibility" test in this case and not the "reasonable probability" test it claims that it applies.[9] Consequently, I must respectfully dissent.
HOUSTON and STEAGALL, JJ., concur.
[2] The following objection was made before Shevlin testified:
"MR. STOREY: Your Honor, I think they are getting ready to introduce the [toxicological] analysis report. Ms. Shevlin that was received [sic] at the lab and that these tests were performed on the samples that were sent. We would object to any introduction of that report or any results of these tests on the basis [sic] has failed to lay a proper predicate showing the continuous chain of custody as to both the subject person, which would be the body of Curtis Brown, and the samples taken from that body.
 "There has been testimony presented by Dr. Perades that he took samples and that he sent the samples to Auburn and he put them in some containers but there has been no testimony as to the chain of custody of that body from the scene or at least from the hospital. As far as the evidence, there's been no proper chain of custody of the body up to the point that even his blood samples were taken. Even more importantly, there has been no continuous chain of custody as to how these things were mailed or what happened in the meantime. I realize that the cases show that the United States mail is generally considered to be a proper way to mail such as this, maybe even U.P.S. is a proper way. But the cases say that you still have to prove that chain of custody. You can't just say, 'we sent it.'
 "In the case of Miller v. State [484 So.2d 1203
(Ala.Cr.App. 1986)], in that case it stated that the chain of custody for a sample of the defendant's blood was not adequate where [the] specimen was not placed in the United States mail, but rather regular outgoing mail for the Trooper's Department. To establish a sufficient predicate for admission into evidence, it must be shown that there was no break in the chain of custody. In that particular case the sample was properly packaged as in this particular case, but it was just put in the outgoing mail. Some unknown person probably or possibly took it to the post office and mailed it through the United States mail. Here, we don't even know what occurred in that regard but there are continuous breaks in the body and also as far as the custody of the sample as to what happened to it once it was taken from the body.
 "So, we would move to suppress any evidence of any tests or any [toxicological] report that was done by Ms. Shevlin. Thank you.
"MR. COBB: Judge, first of all, Dr. Perades testified that the coroner — he received his instructions from the coroner and labeled it as the body of Curtis Green. He said that. He said that he took the samples from Curtis Green's body himself and he said that they were properly packaged in containers normally used by the Department of Forensic Sciences. This lady has not had the chance yet to testify, and I plan for her to testify, as to what she received from the Department of Forensic Sciences in Dothan in .P.S. containers normally used by the Department of Forensic Sciences."
After Shevlin testified, counsel made the following objection:
"MR. STOREY: Your Honor, we continue our objection as they have failed to lay a proper predicate showing the continuous chain of custody as to both the subject and also as to the samples taken from that subject prior to the time that it reached Ms. Shevlin.
"THE COURT: Is Robert Byrd going to testify?
"MR. COBB: Judge, we did not subpoena him. However, I understood he was listed on some witness lists that were sent in this case. I'll put it this way, we would certainly do everything that we could to get him here if the Court felt that it was necessary to meet our predicate. However, we feel that we've met our predicate. We could go ahead and take the testimony from Ms. Shevlin with the understanding we will get him here.
"MR. WADDELL: We object to that.
"THE COURT: I overrule the objection."
[3] In her initial brief, the plaintiff argues:
 "There is more than one missing link in the present case each of which separately as well as jointly requires a reversal of the judgment below.
 "As was testified to by the state toxicologist, Laura Shevlin, she did not know what had happened to the samples before she received them; or who put them in the container in which they were received; or who had turned them over to UPS; or as to the procedure whereby UPS received them; or where they might have been from the time they were taken and the time they were put into the hands of UPS; or as to what medications were administered to Curtis Green at the scene of the accident; or as to whether or not the body had properly been identified as being the body of Curtis Green.
". . . .
 "Not only was there not any testimony in this case by the Coroner, Robert Byrd, or by Dr. Perades' assistant, 'Mr. Carpenter[,]' as to the chain of custody and proper identification of the body as being the body of Curtis Green, but Dr. Perades did not testify as to who took the specimens from the laboratory. His only testimony was that he took the specimens from the body and 'sent' them to the Department of Forensic Sciences in Auburn 'in containers' provided and used by the State of Alabama. In addition to Dr. Perades' not testifying as to how he 'sent' the specimens, there is nothing in the record to account for the whereabouts of the specimens between the time they were taken from the body by Dr. Perades and the time they were received by Laura Shevlin. This break in the chain of custody cannot be considered a minor break. Morgan v. State, 570 So.2d 859 (Ala.Crim.App. 1990); Suttle v. State, [565 So.2d 1197 (Ala. 1990)]; Miller v. State, 484 So.2d 1203 (Ala.Crim.App. 1986)."
Not once is there any mention of what the majority classifies as a "patent discrepancy."
[4] The majority holds that "We . . . are not confronted by a chain of custody comprised of 'weak links,' but by a chain from which links are entirely missing." Williams was a "weak link" case, not a "missing link" case. The Williams rule states that "[t]he evidence need not negate the most remote possibility of substitution, alteration, or tampering with the evidence, but rather must prove to a reasonable probability that the item is the same as, and not substantially different from, the object as it existed at the beginning of the chain." Williams,548 So.2d at 520. The admission of the evidence in Williams was found not to be erroneous.
[5] There is absolutely no evidence in this case that this sample had "passed through several hands," as was true in Rodgers. The doctor who took the urine sample testified that he took it, put it in a sealed container provided to him by the State of Alabama, and sent it to the State forensic lab. Where is the evidence of the urine sample having "passed through several hands" before it was analyzed?
[6] Dr. Perades testified that he performed the autopsy on Curtis Green's body, and there is no suggestion that the record shows that Dr. Perades did the autopsy on a body other than that of Curtis Green. He stated, without objection, that it was the body of Curtis Green, and plaintiffs counsel himself further identified the body as that of Green when he asked Dr. Perades:
 "Q. Dr. Perades, in performing that examination of Curtis Green, did you make a determination as to the cause of death?
"A. Yes, sir, I did.
"Q. What was that determination?
 "A. In my opinion, he died from electrocution. He was electrocuted."
The plaintiff's counsel further showed Dr. Perades a picture of Curtis Green, and had him testify about severe burns on Green's body and the location of those burns.
The plaintiff's counsel, in cross-examining Dr. Perades, also established and confirmed Dr. Perades's earlier testimony that he had drawn the samples and had sent them to the State lab:
 "Dr. Perades, you said that various samples were taken and sent to Auburn?
"A. Yes, sir.
"Q. Who drew those?
"A. I did.
"Q. You yourself drew them?
"A. Yes."
[7] The so-called "patent discrepancy" the majority finds because Dr. Perades did not mention "blood" as one of the items drawn, was not a ground of counsel's argument at trial or in the plaintiffs initial brief, and was mentioned only in a one-sentence argument in the reply brief on appeal.
[8] Suttle v. State, 565 So.2d 1197 (Ala.Cr.App. 1990), cited by the majority in support of its decision, 597 So.2d at 1332, involved an "unsealed sample." (Emphasis added.)
[9] It is obvious that the majority is applying a "remote possibility" test, because it follows Rodgers, the Virginia case, and uses in its opinion the word "conjecture," which was used in that Virginia case. *Page 1336